Argued February 11, demurrer sustained and petition dismissed April 5, rehearing denied September 27, 1921.

## CENTRAL OREGON IRR. CO. *v.* PUBLIC SERVICE COMMISSION.

(196 Pac. 832.)

Constitutional Law—Waters and Watercourses—Raising or Lowering of Maintenance Fee Charged Settler on Reclaimed Desert Land Would Impair Contract.

1. The right of a settler under contract with an irrigation company on reclaimed and irrigated desert lands acquired by the state from the United States under the Carey Act (U. S. Comp. Stats., § 4685) to the use of water thereon under the state act of February 28, 1901 (Laws 1901, p. 378), is contingent on his contract to purchase and acquire title to the land, the annual maintenance fee being one of the considerations entering into the agreed price of the land, so that to change the maintenance fee either by raising or lowering it would increase or decrease the agreed price, and impair the obligation of a contract to buy and sell real estate with an appurtenant water right.

Waters and Watercourses—Irrigation Company not a "Public Utility" Subject to Jurisdiction of Public Service Commission.

2. In making contract with settlers on reclaimed desert lands acquired by the state from the United States under the Carey Act

2. On power of Public Service Commission to increase franchise rates, see note in 9 A. L. R. 1165.

Effect of contract with patrons to preclude regulation of rates of public service corporations is considered in a note in L. R. A. 1915C, 282.

(U. S. Comp. Stats., § 4685), irrigation company *held* not a public utility as defined by Section 6030, Or. L., the use of the irrigation waters furnished by the company to the settlers under their contracts not being a public use to vest jurisdiction of the matter of increasing the maintenance fee charged the settlers by the company in the Public Service Commission under Sections 5777, 5788.

Original Proceeding in Supreme Court.

In Banc.

The plaintiff, an Oregon corporation, which hereafter will be referred to as the company, filed its petition in this court for an order to compel the Public Service Commission of Oregon, defendant, which hereafter will be referred to as the commission, to proceed with and complete the hearing of the company upon its application before the commission for an increase of what is known as the "maintenance fees" of its irrigation system and to hear and determine the amount of such fees to be paid by the "settlers" under their respective contracts. By section 5817, Or. L., after July 1, 1915, the "Railroad Commission of Oregon" is designated "Public Service Commission of Oregon." Under Section 8035, Or. L., "The Railroad Commission of Oregon is vested with power and jurisdiction to supervise and regulate every public utility in this state, and to do all things necessary and convenient in the exercise of that power and jurisdiction." The lands involved are now in Deschutes County, and were formerly in Crook County, and lie under and are to be reclaimed by and irrigated from the waters of the Deschutes River.

On March 3, 1877, Congress passed a law entitled "An Act to provide for the sale of desert land in certain states and territories," known as the Carey Act, which was amended on March 3, 1891, and again

amended on August 18, 1894. Section 4685, United States Compiled Statutes of 1916, reads as follows:

"That to aid the public land states in the reclamation of the desert lands therein, and the settlement, cultivation and sale thereof in small tracts to actual settlers, the Secretary of the Interior with the approval of the President, be, and hereby is, authorized and empowered, upon proper application of the state to contract and agree, from time to time, with each of the states in which there may be situated desert lands as defined by the Act, etc., binding the United States to donate, grant and patent to the state free of cost for survey or price such desert lands, not exceeding one million acres in each state, as the state may cause to be irrigated, reclaimed, occupied, and not less than twenty acres of each one hundred and sixty acre tract cultivated by actual settlers, within ten years next after the passage of this Act, as thoroughly as is required of citizens who may enter under the said desert land law."

Before the application of any state is allowed or any contract is executed or any land is drawn from the public domain "the state shall file a map of the said land proposed to be irrigated and shall exhibit a plan showing the mode of the contemplated irrigation, which plan shall be sufficient to thoroughly irrigate and reclaim said land and prepare it to raise ordinary agricultural crops and shall also show the source of the water to be used for irrigation and reclamation." The Secretary of the Interior may make necessary regulations which "shall be of no force whatever if such map and plan shall not be approved." Subdivision 3 of Section 4685 provides:

"Any state contracting under this section is hereby authorized to make all necessary contracts to cause the lands to be reclaimed, and to induce their settlement and cultivation in accordance with and subject

to the provisions of this section; but the state shall not be authorized to lease any of said lands or to use or dispose of the same in any way whatever, except to secure their reclamation, cultivation and settlement."

Subdivision 4 enacts that as fast as any state shall furnish satisfactory proofs "that any of said lands are irrigated, reclaimed and occupied by actual settlers, patents shall be issued to the state or its assigns for said lands so reclaimed and settled," and that the states "shall not sell or dispose of more than 160 acres of said lands to more than one person."

Under the provisions of this law, the State of Oregon, through its Desert Land Board, applied to the Secretary of the Interior and filed its map to have about 140,000 acres of land then in Crook County and now in Deschutes County, withdrawn from the public domain and set aside to be reclaimed as desert lands, and as reclaimed that patents therefor should be issued to the State of Oregon or its assigns. Based upon such application and the showing made, the lands were withdrawn and placed under the provisions of the Carey Act. Following this, the legislature of the State of Oregon on February 28, 1901, passed a law entitled:

"An act to provide for the acceptance for the State of Oregon of certain lands and for the reclamation and disposal of the same."

Pursuant to such proceedings, the Pilot Butte Development Company, an Oregon corporation, filed its application with the State Land Board for a contract to reclaim 84,707.74 acres of the land so withdrawn, and on May 31, 1902, a contract was made between that company and the State Land Board, in and by

which it was agreed that the company, for and in consideration of the reclamation of such lands, should have a lien thereon for $848,577. Among. other things, the contract recites that in compliance with the Carey Act and the Oregon statute, the Development Company had filed with the State Land Board an application for a contract to reclaim certain specified desert lands, and had agreed to build and construct an irrigation system in substantial compliance with certain plans which were submitted and approved; and that it was to furnish an ample supply of water to reclaim the lands described in the contract, in compliance with the acts of Congress by which the lands were granted to the State of Oregon.

The State Land Board fixed and agreed upon the sum of one dollar per acre for each acre of land reclaimed in each and every subdivision as and for the annual maintenance charge of the irrigation system, and for interest thereon at the rate of 6 per cent per annum, and created a lien thereon "valid on and against the separate legal subdivisions of the land reclaimed for the amounts due as agreed upon and interest thereon at the rate of 6 per cent per annum from date of reclamation until said lien shall have been satisfied." The contract of the Pilot Butte Development Company with the State Land Board was later assigned to the Deschutes Irrigation and Power Company, also an Oregon corporation. On June 17, 1907, another and supplemental contract was entered into between the Deschutes Irrigation and Power Company and the State of Oregon, for a portion of the remaining lands, which provides that the Power Company shall have a lien for the amount due it for the reclamation of the lands specified in the lists

marked "A" and "B," the amount of which shall be apportioned to each 40-acre tract, that as to all land which can be cultivated and irrigated by gravity flow, the reclamation lien shall be forty dollars per acre and for nonirrigable land, two and one-half dol- lars per acre. This agreement provides for the sale of water rights to qualified applicants for said lands, and that such rights shall be approved and fixed to each smallest legal subdivision, and that they shall be perpetual in nature and shall convey a proportionate interest in the reclamation works embraced in the contract, and that one water right should be sold for each acre of irrigable land susceptible of irrigation by gravity flow from the canal system in each and every list of lands hereafter opened for entry and sale. It further provides for the sale of all of the right, title, and interest of the Power Company in the whole irrigation system "to a corporation of water users ten years from the date of the contract, provided that such corporation shall have been duly and legally organized and have the approval of the State Land Board." The contract recites:

"The rights of the settler are transferable only with the land and the covenants of the contract run with the land and the payments specified are a first lien and are appurtenant to the land and binding upon each party."

The water is to be deeded and become appurtenant to the specific land described in the contract, and none other, and the "settler" agrees to pay the amount of the lien due the company for reclamation as fixed by the contract with the State of Oregon with accrued interest. The petitioner company has ac- quired and is now the successor in interest of all the rights, contracts, and franchises of the Deschutes

Irrigation and Power Company. After obtaining the contracts with the State Land Board for the reclamation of the lands therein described, the company then entered into the written contracts with the "settlers" reciting all of the preliminary proceedings, and among other things, providing for a "maintenance fee" of either eighty cents or one dollar per irrigable acre. To obtain a contract the "settler" must be a citizen of the United States and of lawful age, and must not have made any previous filing under the Carey Act which with his present application would exceed 160 acres of land. The "settler" applies to the company for all of a certain described tract of land containing so many acres "and for the release of a lien thereon owned and held by the company for the reclamation thereof, which said lien was created by the terms of a contract between the State Land Board and the company." "In consideration thereof and of the delivery and possession of said land to the applicant prior to date of reclamation of the amounts herein agreed to be paid, he promises and agrees to pay the sum of $——, the amount of the lien due the company for reclamation as evidenced by the contract of the company with the State of Oregon." Provision is made for the payment of a certain amount in cash at the signing of the contract, and that the amount remaining shall be paid in future installments at different times, with interest on deferred payments at the rate of 6 per cent per annum, which "shall be evidenced by the promissory notes of the 'settler' in favor of the company, its order or assigns." The notes contain a provision for the payment of "reasonable attorneys' fees" and "express upon their face that they are executed to evidence the said deferred payments mentioned in the application and

agreement and that they are subject to the terms hereof." The agreement further recites, if such notes are not paid as provided for in the "application and agreement" the company may proceed to collect them "as it may be advised" "and may foreclose this application and agreement in the manner provided by law for the foreclosure of contracts for the purchase and sale of real property or otherwise." The company agrees

"Upon the payment of the reclamation lien above mentioned, in accordance with the terms and conditions herein expressed, to release said reclamation lien on the land above described and authorize the State Land Board of the State of Oregon to deed to the first party, the above-described tract free from the reclamation lien thereon held by the second party and subject to the annual maintenance charge of one dollar per acre mentioned in the contract between the State of Oregon and the second party."

One form of contract provides that the lien for the maintenance charge will be released upon the payment of six dollars per acre. Although in other respects, the three forms of the "settlers'" contracts are somewhat different, yet in all of them, the "settler" undertakes and agrees to pay a certain sum for the reclamation of a particular tract of land and in addition thereto, to pay a fixed maintenance charge of either eighty cents or one dollar per irrigable acre. When all payments have been made and the required proofs filed, the "settler" then becomes entitled to and receives a deed from the state to the land described in his contract. It is stipulated that about 340 "settlers" signed for contracts on form No. 1 and that upon forms No. 1, and No. 2 contracts were signed for about 26,000 acres of ir-

rigable land, and that upon all three forms about 1,250 contracts were signed covering about 44,000 irrigable acres, all of which are now outstanding. By its articles of incorporation the petitioner is empowered:

1. "To acquire, take over, hold, operate and manage the property, contracts, and irrigation system heretofore owned, held, enjoyed or operated by the Deschutes Irrigation and Power Company," etc.

2. "To reclaim arid lands by irrigation in the State of Oregon, under the acts of Congress known as 'The Carey Act' or otherwise * * and to make and enter into such contract or contracts with the State of Oregon, its Desert Land Board, the United States of America and any of its departments," and for such purposes to construct ditches, canals, flumes, irrigation, and drainage systems, and to do and perform all acts necessary to carry out its objects and purposes.

3. To divert, appropriate, and use the waters of springs, streams, and lakes and to convey and distribute same.

4. To appropriate, use, divert, and furnish such waters in the State of Oregon for general rental, sale, distribution, or for irrigation use, household and domestic purposes, the watering of live stock upon the dry lands of the state and to collect rates or compensation for such sale, supplies and such thereof, to all persons whose lands lie adjacent to or within reach of the line of the ditch, canal or flume without discrimination other than priority of contract.

5. To furnish water to towns, cities, or municipalities, or to distribute for fire protection, or for any other use public or private.

Other powers are conferred, which are immaterial to this case.

"In October, 1915, the Central Oregon Irrigation Company Water Users Association, a co-operative

association," filed its complaint against the company in the instant case, with the Public Service Commission of Oregon, in which it was alleged that the irrigation system of the company is insufficient in size and capacity to provide a reasonable service, that it has failed and refused "to repair such structure or provide for adequate maintenance of its system, although the water users have contributed large sums for that purpose, and that the defendant has discriminated unjustly in the distribution of water." To that proceeding the petitioner here, in an original proceeding in this court, "applied for a writ of prohibition, restraining the commission from proceeding to hear and determine any matters pertaining to the defendant's operations." A demurrer to the petition was interposed and sustained on the ground that the Supreme Court had no jurisdiction. "A similar writ was sought in the Circuit Court of the State of Oregon for Marion County. A demurrer to the petition was sustained on the grounds that the company had an adequate remedy by instituting suit to restrain the enforcement of the commission's order. Without waiving its objections to jurisdiction and reserving all its rights, the company here filed an answer denying all the material allegations of the petition, and pleaded want of jurisdiction and the failure of the water users of the Central Oregon Irrigation Company to pay 'maintenance fees.' " A public hearing was had at Bend, Oregon, and a "personal inspection of the irrigation system was made by the commission," which found that it had jurisdiction and made numerous findings of fact providing that certain improvements should be made and that a reserve fund should be created out of "maintenance

fees" and that the moneys therein "shall be expended only for the purposes intended and according to plans which will be submitted to the commission for its approval." This decision was rendered December 27, 1917. In June, 1919, the company in the instant case filed with the Public Service Commission, its petition for an increase of "annual maintenance fees" on the grounds and for the reasons therein alleged. The Central Oregon Irrigation District intervened in said proceedings and filed a demurrer to said petition. On March 20, 1920, the company filed an amended petition, answers to which were filed, and on April 1, 1920, at Redmond, a two days' hearing was had before the commission and testimony was taken and the commission on the objection to jurisdiction made by the attorneys for the Central Oregon Irrigation District, submitted the question to the Attorney General, and on June 15, 1920, the commission made an order dismissing the petition for want of jurisdiction. November 20, 1920, the plaintiff filed its original petition for writ of *mandamus* in this court against the commission, in which it prays for an order that the commission shall be commanded and directed "to complete the hearing upon the petitioner's application for an increase in maintenance fees and determine the same or show why it has not done so by due return of said writ." Based upon the petition, this court issued an alternative writ of *mandamus* to which the Public Service commission of Oregon filed a demurrer upon the following grounds:

1. "That said writ of *mandamus* does not state facts sufficient to justify the issuance of said writ, nor facts sufficient to constitute cause of action or suit.

2. "That the court has no jurisdiction of this proceeding.

3. "That the proceeding has not been commenced within the time limited by law.

4. "That there is a defect of parties defendant in that the settlers under the Carey Act are necessary parties defendant."

Thereafter H. H. Dietrich and the Central Oregon Irrigation District applied to this court for leave to be made defendants in the instant case and with the showing made tendered an answer in which a full and complete history of the whole transaction from its inception is set forth and alleged, and copies of all the different contracts including those with the "settlers" are attached to and made a part of the answer. They object "to the exercise by the Supreme Court of the State of Oregon of any jurisdiction in the premises and pray that said alternative writ of *mandamus* may be dismissed and that these defendants recover their costs and disbursements from the petitioner." To this the Central Oregon Irrigation Company filed a demurrer "on the ground that said answer does not state facts sufficient to constitute a defense or answer to said writ." Although the record is voluminous, yet in the final analysis, two questions only are presented. First: Would the raising of the "maintenance fee" impair the obligation of the "settlers'" contracts? Second: Does the commission have jurisdiction of the subject matter?

DEMURRER SUSTAINED AND PETITION DISMISSED. RE-HEARING DENIED.

For the demurrer (and defendant) there was a brief over the names of *Mr. I. H. Van Winkle,* Attorney General, and *Mr. L. A. Liljeqvist,* Assistant At-

torney General, with an oral argument by *Mr. Liljeqvist.*

For the plaintiff there was a brief over the names of *Mr. Jesse Stearns, Mr. Denton G. Burdick* and *Mr. Jay H. Upton,* with an oral argument by *Mr. Stearns.*

For defendants, H. H. Dietrich and Central Oregon Irrigation District, there was a brief over the names of *Mr. Harrison Allen, Mr. John E. Latourette, Mr. H. H. De Armond* and *Mr. Charles W. Erskine,* with an oral argument by *Mr. Allen,* and *Mr. Latourette.*

JOHNS, J.—In the inception of the transactions out of which this litigation arose, the lands belonged to the public domain, and the title was in the United States government. Claiming that the lands were subject to reclamation under the terms and provisions of the Carey Act, the state filed its application with the Secretary of the Interior to have 140,000 acres set aside and reclaimed through irrigation, and the government made the order. This was followed by an act of the legislature of this state authorizing the making of the necessary contracts. Based upon such proceedings, the State Land Board entered into the different contracts with the company and its predecessors in interest, in and by which they undertook and agreed to construct, operate, and maintain an irrigating system, and through the means of canals, flumes, and ditches, to furnish and provide the amount of water necessary to irrigate and reclaim a large portion of the entire tract of 140,000 acres which was set aside and withdrawn under the Carey Act, in consideration of which the contract provided that the company should have what is known as a

reclamation lien upon the lands embraced within its respective contracts, and that in addition thereto and as a part thereof, it should have and charge what is known as a "maintenance fee." In the first instance this was an annual charge of eighty cents per acre. Thereafter it was fixed at one dollar per acre. After obtaining such contracts from the state, the company proceeded to construct the irrigation system and divert the waters of the Deschutes River to and upon the lands described in its contracts. In this situation it went out among what is known as the "settlers" and procured contracts with them in and by which each "settler" made application to the State of Oregon to purchase and acquire title to a specific portion of the land, which in no event was more than 160 acres to any one person, and as a part of such application each "settler" promised and agreed with the company to pay it a stipulated reclamation fee of about fifty dollars per acre for each acre of irrigable land, and in addition thereto and as a part thereof to pay the company the stipulated "maintenance fee" of either eighty cents or one dollar per acre as the contract provided.

The contracts between the state and the companies provide that the company shall have a lien upon the lands for the full amount of both the reclamation fee and the "maintenance fee" and such provisions are carried into and made a part of the contracts between the company and the "settlers" and no "settler" can acquire title from the state to his particular land without first having paid the full amount of both of such fees which are charges upon his land. Although the Carey Act provides for payment of the reclamation lien as one of the conditions upon which

title to land may be acquired, nothing whatever is said in the act about a lien or the payment of a lien for a "maintenance fee," yet under the "settlers'" contracts, provision is made for the payment of a "maintenance fee" and a lien is given to insure its collection.

It is contended by the company that it is a public utility, that the use of the water by the "settlers" is a public use, and that their contracts come under the terms and provisions of "The Public Utilities Act" (§§ 6030–6108, Or. L.), and that the commission not only has the power, but that it is its duty to hear and determine what is a reasonable "maintenance fee" which the company should charge and receive for the use of water distributed to the "settlers," and that the "maintenance fee" provided for in the contracts is not a reasonable or just compensation, and that the amount of such fee should be increased so as to provide the company a fair return on its investment.

The defendants contend that it is not a matter within the jurisdiction of the Public Service Commission, that the use of such waters is not a public use, and that the increase of the "maintenance fee" would impair the obligation of a contract.

The "settler" must be a citizen of the United States over twenty-one years of age, and in no event can a contract be made for more than 160 acres. In the event of a previous contract to obtain land under the Carey Act in another project, the "settler" is then limited to the amount of land which would remain out of a total of 160 acres. In the instant case, it is confined to a specified portion of the land which was set aside and withdrawn for this particular project, and a "settler's" contract could not be made to ac-

quire title to a portion of any other or different land. At the time the application to purchase is made, the "settler" is required to pay a certain percentage in cash and to execute promissory notes for the amount of the deferred payments, with interest from date. Provision is made in the notes in the event of suit or action, for the payment of reasonable attorneys' fees. The amount of the reclamation fee and the annual "maintenance fee" is made a charge and lien upon the land, and the agreement to pay the amount of such charges are covenants running with the land, and title cannot be acquired without the payment of such charges and liens. Such contracts must be made with the company, and are subject to the approval of the State Land Board, and no valid or binding contract can be made without such approval. By the terms of his contract, the "settler" agrees to pay a certain stipulated amount with accrued interest as one of the conditions upon which he receives his deed and acquires title. The "maintenance fee" is a lien, and is made one of the fixed charges which enters into and is a part of the consideration for the purchase price. To raise or to lower the amount of that fee would be to increase or decrease the agreed purchase price of the land. When analyzed, the "settlers'" contracts are nothing more than an agreement to buy and sell certain described real estate, with an appurtenant water right attached to and running with each tract of land, and the contract expressly provides that the water shall be used upon the specific land described in the contract and that it cannot be used upon any other or different land.

1. The land is the subject matter of the contract. It is that which is bought and sold. Upon the com-

pletion of his contract, the purchaser obtains title to the land itself. He does not contract for, and never does acquire, title to the water. In that particular, his agreement is confined and limited to the use of the water upon the specific land described in his contract, and the right to such use is appurtenant to and runs with the land. In other words, the right of the "settler" to the use of the water is contingent upon his contract to purchase and acquire title to the land, without which he would never have any right to the use of the water, and the annual "maintenance fee" is one of the considerations which enters into and is a part of the agreed purchase price of the land. To change the "maintenance fee" by either the raising or the lowering of it would increase or decrease the agreed purchase price of the land, and would impair the obligation of a contract to buy and sell real estate with an appurtenant water right.

2. The remaining question is the jurisdiction of the commission. Section 5777, Oregon Laws, provides that:

"The use of the water of the lakes and running streams of the State of Oregon, for general rental, sale or distribution, for purposes of irrigation, and supplying water for household and domestic consumption, and watering livestock upon dry lands of the state, is a public use, and the right to collect rates or compensation for such use of said water is a franchise. A use shall be deemed general within the purview of this act when the water appropriated shall be supplied to all persons whose lands lie adjacent to or within reach of the line of the ditch or canal or flume in which said water is conveyed, without discrimination other than priority of contract, upon payment of charges therefor, as long as there may be water to supply."

Section 5788 enacts:

"This act may at any time be amended by the legislative assembly, and Commissioners' for the management of water rights and the use of water may be appointed and rates for the use of water may be fixed by the legislative assembly, or by such commissioners; but rates shall not be fixed lower than will allow the net profits of any ditch or canal or flume or system thereof to equal the prevailing legal rate of interest on the amount of money actually paid in and employed in the construction and operation of said ditch or canal or flume or system thereof."

Laws of 1901, pages 378, 381, Section 4, provides:

"The State Land Board shall by said contract fix the amount due the person, company of persons, association or incorporated company for the reclamation of said land, and the annual charge for the maintenance of the irrigation system."

Section 6030, Oregon Laws, says:

"The term 'public utility,' as used herein, shall mean and embrace all corporations, companies, individuals, associations of individuals, their lessees, trustees or receivers (appointed by any court whatsoever), that now or hereafter may own, operate, manage or control, any plant or equipment or part of a plant or equipment in this state for the conveyance of telegraph or telephone messages, with or without wires, or for the transportation of persons or property by street railroad as common carriers, or for the production, transmission, delivery or furnishing of heat, light, water or power, and any and all whether either directly or indirectly to or for the public, and whether said plant or equipment or part thereof is wholly within any town or city, or not. No plant owned or operated by a municipality shall be deemed a public utility under or for the purposes of this act."

Under the above sections and its articles of incorporation, the company contends that it is a public utility and that the use of the water by the "settlers" under their respective contracts, is a public use and that the State Land Board has fixed the amount of "the annual charge for the maintenance of the irrigation system," that the state has the right to change the contract with the company and increase the "maintenance fee," and that the commission is acting for and represents the state and that it not only has the power, but that it is its duty to increase, the amount of the "maintenance fee," so that the receipts therefrom would "equal the present legal rate of interest on the amount of money actually paid in and employed in the construction and operation of said ditch, canal, or flume, or system thereof."

If the plaintiff is a public utility and the use of the waters by the "settlers" is a public use and if the amount of the "maintenance fee" was only a question between the petitioner on one side and the State of Oregon or one of its legal subdivisions on the other, the contention of the company would have to be sustained. That is the legal force and effect of the decision of this court in *Woodburn* v. *Public Service Commission,* 82 Or. 114 (161 Pac. 391, Ann. Cas. 1917E, 996, L. R. A. 1917C, 98), where it is held that—

"When the owner devotes his property to a use in which the public has an interest, he must submit to be regulated and controlled by the public for the common good."

"The regulation of rates for the purpose of promoting the public health, comfort, safety and welfare is an exercise of the police power of the sovereign."

"When the state exercises its police power, it does not work any impairment of obligation of the con-

tract; the possibility of the exercise of such power being an implied term of the contract."

This decision was followed in the case of *Portland* v. *Public Service Commission,* 89 Or. 325 (173 Pac. 1178), where it was held:

"It is primarily the duty of the state in the interests of the public to see that all concerns that serve the public be content with and are entitled to receive reasonable compensation for their services." "That the regulation of rates of the fares of a street railway is within the police power of the state"; and that the order of the Public Service Commission, changing the rate of fare specified in the franchise, is not void for impairment of the obligation of a contract "because of depriving the city and its inhabitants of property rights without due process of law," and that the Public Service Commission as an agent of the state "could agree to a change in the franchise allowing the company an increased rate of fare."

This legal principle was later followed and approved by this court in the *City of Hillsboro* v. *Public Service Commission,* 97 Or. 320 (187 Pac. 617). Those decisions have become and are the settled law of this court. From an examination of the exhaustive notes in the *Virginia Western Power Co.* v. *Commonwealth of Virginia,* 125 Va. 496 (99 S. E. 723, 9 A. L. R. 1148), it will be found that such legal principles are sustained by the decided weight of authority. In the first case which was before it on the petition of the water users association, and over the vigorous protest of the petitioner here, the commission held that it had control of and authority over the moneys derived from the "maintenance fees" and from which ruling no appeal was taken and that decision became final. In the second case, based upon the petition of the company here, to raise the

"maintenance fee" and after an inspection of the premises and the taking of some testimony and upon the objection of the "settlers," the Public Service Commission held that it did not have any jurisdiction over the subject matter, and for such reason made an order dismissing it, from which no appeal was ever taken, and that decision became final.

Its last ruling is founded upon a decision of Judge ROBERT S. BEAN of the United States District Court of Oregon, in *De Pauw University* v. *Public Service Commission of Oregon,* 247 Fed. 183, in which, among other things, the syllabus says:

"A corporation, and its predecessor, engaged in the sale of irrigable land, which acquired a source of water supply and installed an irrigation system, entering into contracts with the purchasers to furnish water for irrigation, is not subject to regulation under the Oregon Public Utilities Act (Laws Or. 1911, p. 483), for Section 1, defining a 'public utility' as including corporations which shall own, operate, manage, and control any plant or equipment for the delivery or furnishing of water or power directly or indirectly to the public, does not extend the act to mere private corporations."

Upon the facts therein stated, the opinion holds that "neither the Luse Company nor its predecessor in interest come within this definition for they were not engaged in furnishing or selling water to or for the public, but only to such parties as they might select," and further says that—

"The distinction between a public service irrigation company and a private concern is so fully covered by the Supreme Court of California in *Thayer* v. *California Development Co.,* 164 Cal. 117 (128 Pac. 21), and *Del Mar Water, Light & Power Co.* v. *Eshleman,* 167 Cal. 666 (140 Pac. 591, 948), that it would be useless for me to attempt to add anything thereto."

The case of *Thayer* v. *California Development Co.,* 164 Cal. 117 (128 Pac. 21), is exhaustive and well considered, and holds that:

"Where an irrigation company which appropriated water from a river to irrigate a named county, organized subsidiary corporations for the purchase of the land in that territory, and transferred to them perpetual water rights for the irrigation of land owned by them, there was no dedication of the water right to public use; the essential feature of a public use being that it shall not be confined to privileged individuals, but open to the indefinite public, while in this case not every land owner could use water.

"As Const., Art. XIV, Sec. 1, which has been in force for over thirty years, and which provides that the use of the water now appropriated for sale, rental, or distribution is a public use, has never been construed as declaring that water taken for the irrigation of a fixed tract is appropriated for the public use, and it has been expressly declared by statute that such water rights are appurtenant to the land, the mere appropriation of water for the purpose of sale to given individuals is not a dedication or appropriation to public use."

To the same effect is the decision of that court in *Mound Water Company* v. *Southern California Edison Co.* (Cal.), 194 Pac. 1014.

Although under its articles of incorporation, it has other powers, the primary purpose of the company was the reclaiming by means of irrigation of certain arid lands in Oregon under the Carey Act. That was the real purpose for which the corporation was organized. It was for such reason that it made the contracts with the State of Oregon, founded upon which it entered into the numerous and different contracts with the "settlers." The theory of the whole scheme was that the company would furnish the water to re-

claim the land, and that by the use of such water and a compliance with their respective contracts, the "settlers" would acquire title to the specific portions of the land therein described, and that in consideration of furnishing the water the company was to have and receive the agreed reclamation fee and the annual "maintenance fee." To obtain a contract, the "settler" must be a citizen of the United States, and the application is subject to the approval of the company and the State Land Board. Although it does embrace all of that class, yet the fact remains that the right of a contract to purchase and acquire title to land is confined and limited to a certain specified class of persons, and that it is not inherent in the "settlers" and does not exist as a matter of public right.

"It is a well-established proposition that a water system of this character, so owned and controlled is not a public utility and that the water owned, held, and used in that manner is not dedicated to public use." *Mound Water Co.* v. *Southern California Edison Co.* (Cal.), 194 Pac. 1014.

As to its contracts made by the "settlers," the company was not a public utility, and the use of the waters by them was not a public use.

Under the stipulated facts it appears that the company is supplying water for irrigation and domestic use for about 5,000 acres of land which are outside of the lands within the Carey Act, that it is also furnishing a certain amount of water for use in the cities of Bandon and Redmond and to the town site of Deschutes, and that it has also furnished water for irrigation and domestic use to certain private persons who are not under the Carey Act. In *Mound Water Co.* v. *Southern California Edison Co.* (Cal.), 194 Pac. 1014, the opinion says:

"It has been held that a water company may devote a part of its water supply to private use, or it may dedicate a portion of its water to a public use, and reserve the remainder, if any, for some private use, although it cannot after dedicating any part to public use, transform any of that part into a private use, without the consent of the proper public authority."

It may be true that as to all of such matters the company is a public utility, and is acting as such, and that the use of such waters is a public use, but as the opinion in the California case says that question was not before the court and it is not before this court, and upon that point we decline to express an opinion. Again the contract between the Deschutes Irrigation and Power Company and the state, executed on June 17, 1907, contemplates and provides that the land and appurtenant water rights may be turned over to the purchasers "free from any perpetual charge or lien for maintenance" and that the owner of each tract of land subject to certain reservations shall have his *pro rata* share in the whole irrigation system, "and shall hold his lands free of any maintenance charge." The "settler's" contract recites that:

"In the event that the company shall transfer the said irrigation system to a water users association to be formed pursuant to the provisions of said contract of June 17, 1907, shares of stock in said corporation shall be delivered by the company in lieu of the conveyance of water rights hereinbefore provided for."

Upon a compliance with the terms, the contracts clearly indicate that the "settler" has a right to become an owner in the whole irrigation system in proportion to the amount of his payments.

101 Or.—30

We hold that in the making of its contracts with the "settlers" the company was not a public utility, and that the use of the waters by them under their contracts is not a public use and that the increase of the agreed "maintenance fee" would impair the obligation of contract. The demurrer is sustained and the petition for the writ is dismissed.

DEMURRER SUSTAINED AND PETITION DISMISSED.

REHEARING DENIED.

BURNETT, C. J., and BROWN, J., took no part in the consideration of this case.