Argued September 18, affirmed November 18, 1974

ALEXANDER ET AL, *Respondents, v.* CENTRAL
OREGON IRRIGATION DISTRICT (No. 9173),
*Appellant.*
528 P2d 582

*James H. Clarke,* Portland, argued the cause for appellant. With him on the briefs were Bryant & Edmonds, Redmond, and Dezendorf, Spears, Lubersky & Campbell, Portland.

*J. C. VanVoorhees,* Prineville, and *John C. Sterling,* Los Angeles, California, argued the cause for respondents. With them on the brief were Bodie, Minturn, VanVoorhees & Larson, Prineville.

Before SCHWAB, Chief Judge, and FORT and HOWELL, Judges.

FORT, J.

Plaintiffs, owners of lands within the boundaries of defendant Central Oregon Irrigation District, brought a declaratory judgment suit seeking to have certain water rights acquired by defendant district in 1958 impressed with a constructive trust in plaintiffs' favor. The circuit court impressed such constructive trust and ordered the district to transfer the water rights to plaintiffs on payment of a specified amount per acre. Defendant appeals. We review de novo. ORS 19.125 (3).

The relevant history of this matter is long and detailed, but much of it is essential to an understanding of the unique situation at bar.

In 1877, Congress enacted a statute popularly known as the Carey Act[1] to promote the reclamation of public desert lands. The Act, as amended in 1891 and 1894, authorized the Secretary of the Interior to contract with each state and donate thereto such public desert lands as the state should cause to be irrigated, reclaimed and occupied. The Act further allowed a contracting state to enter into all necessary contracts to cause the lands to be reclaimed, settled, and cultivated. U.S. Comp. Stats., § 4685 (1916). *See Central*

[1] Currently, Public Lands, 43 USC § 641.

*Or. Irr. Co. v. Public Service Com.,* 101 Or 442, 444, 196 P 832 (1921). Also, *see generally,* 94 CJS 255-57, Waters § 316.

Pursuant to the Carey Act, the state of Oregon made arrangements to have certain central Oregon lands withdrawn from the public domain and reclaimed, and thereafter transferred to the state or its assigns. Following this, the legislature enacted a law whereby Oregon accepted the conditions and benefits afforded under the Carey Act. Oregon Laws 1901, p 378, General Laws, today found as amended at ORS 555.010. The 1901 Act empowered the State Land Board to fix by contract with the developer the compensation to be paid for the reclamation and in such amount to create a lien or liens on the land in his favor.

Thereafter, the State Land Board contracted with two private developers, Pilot Butte Development Company and Oregon Irrigation Company, for the irrigation of certain of the aforementioned Carey Act lands. Lands currently belonging to the plaintiffs herein were included.

In 1904, both Pilot Butte Development Company and Oregon Irrigation Company assigned their rights to Deschutes Irrigation and Power Company, another private developer. On June 17, 1907, Deschutes Irrigation and Power Company and the State Land Board entered into a supplemental agreement with respect to 44,116.49 acres of the reclamation lands.

The supplemental contract provided for the lien on the lands in favor of the company to be apportioned to each 40-acre tract. Each such lien was to be removed, and appropriate water rights transferred, upon payment by a contracting water settler to the company of

the reclamation lien amount attached to the land he claimed. Such payment, together with his agreement to pay annual water user maintenance fees, entitled the settler to a deed of the land from the state without further cost. The company was empowered to convey one water right "for each acre of arable land susceptible of irrigation by gravity flow," with the total number of water rights sold not to exceed the total number of such irrigable acres. The reclamation lien amount for irrigable land was fixed at $40 per acre. For lands determined to be non-irrigable, the price was $2.50 per acre.

The contract also provided that, ten years from the date thereof, Deschutes Irrigation and Power Company was to surrender all interest in the irrigation works to "a corporation of water users."

Yet another private irrigation concern, Central Oregon Irrigation Company, succeeded to all rights and contracts of Deschutes Irrigation and Power Company in 1910.

In 1917, defendant Central Oregon Irrigation District, appellant herein and hereinafter referred to as COID, was organized as a quasi-municipal corporation in lieu of the water users' association contemplated in the 1907 contract.

By a 1921 decree of the Deschutes County Circuit Court, hereinafter referred to as the Dietrich Decree, COID succeeded to all right, title, and interest in Central Oregon Irrigation Company's Deschutes River irrigation system. In addition, COID was authorized to sell 2,500 acres of water rights to landowners who had irrigated acreage in excess of their allotted contractual rights. All such "excess acres"

or rights were eventually sold to either COID or landowners therein.

By contract in 1927, COID was granted permission by the State Reclamation Commission to reclaim certain additional Carey Act lands. Such lands were to be turned over to settlers under terms substantially similar to those incorporated in the 1907 contract. Again, the per acre reclamation lien amount for this irrigable land was set at $40.

By virtue of the Oregon Water Code of 1909, now ORS ch 536, this state adopted, subject to existing rights, an appropriation system of distributing and recognizing water rights. Under the code, actual application of water to a beneficial use is the basis for recognized rights therein. As between two beneficial users, the prior appropriator has the senior right to water. ORS 537.120, ORS 539.010. *See also: Fitzstephens v. Watson,* 218 Or 185, 196, 344 P2d 221 (1959); Hutchins, *The Common-Law Riparian Doctrine in Oregon: Legislative and Judicial Modification,* 36 Or L Rev 193 (1957).

Appropriations initiated prior to the effective date of the 1909 Act were recognized, provided that progress on works for the application of such water to a beneficial use had thereafter been made "diligently and continuously." ORS 539.010 (4). Furthermore, the state engineer was directed to prescribe, upon request, a cutoff date at which time any part of the initial appropriation not being put to beneficial use would be lost. ORS 539.010 (5).

During the 1920's, an adjudication to determine relative water rights in the Deschutes River was commenced pursuant to the 1909 Code. ORS 539.010 (7),

458

ORS 539.020 et seq.[2] In 1928, a decree was entered in the Deschutes County Circuit Court by Judge T. J. Duffy modifying the order and determination of the state engineer as to the state of such rights.

The Duffy Decree awarded a total of 47,983 acres of so-called "inchoate" water rights within the boundaries of the Central Oregon Irrigation District. With the exception of the "excess acre" rights hereinbefore mentioned, the decree basically made a conditional determination as to the number of acres of land entitled to water on each 40-acre tract, based on contracts between settlers and developers.

The rights awarded on each 40-acre tract were said to be appurtenant thereto. In the words of the Duffy Decree:

"* * * * *

"* * * [T]he rights to the use of water for irrigation purposes hereby confirmed are appurtenant to the lands herein described, and the rights of use of the waters of said stream and its tributaries by virtue of such rights are limited and confined to the irrigation of the lands described

[2] ORS 539.020 provides for the commencement by the state engineer of a procedure for the determination of relative water rights in a stream upon petition for such a determination by one or more water users therein, "if upon investigation he finds that the facts and conditions justify it." Beginning in 1909, petitions for such an adjudication were filed with the offices of predecessor agencies to the state engineer. The procedure itself, as defined in ORS 539.020 through 539.220, essentially involves the state engineer making examination and measurements along the stream, receiving evidence of claims, holding hearings of contest relative to disputed claims, and making findings of fact and an order of determination. The latter are filed with the circuit court, which, after hearing any exceptions to the state engineer's determination, affirms or modifies said determination. Certificates of water rights are thereupon issued in accordance with the court decree, each setting forth the owner's priority date and the extent and purpose of his rights.

herein to the extent of said lands herein set forth, and the priorities of right herein confirmed confer no right of use of the waters of said stream and its tributaries on any lands other than those specified tracts to which such rights are herein set forth as appurtenant, and each and every person shall be and hereby is prohibited, restrained, and enjoined from diverting and using water from said stream on such other lands without lawful permit first obtained from the State Engineer.

"* * * * *."

*See also:* ORS 540.010.

However, the landowner holding the rights could transfer any number of them to other land upon application to the state engineer and a determination by him that no injury to existing rights would result from such change. ORS 540.520-540.530. Furthermore, no formal transfer application was required where the water right was to be shifted from one "forty" to another "forty" on the same farm unit.

Many of the contract water rights recognized in COID landowners by the Duffy Decree had not, at the time of the decree, been perfected by the application of water to a beneficial use on appurtenant lands. In accordance with what is now ORS 539.010 (5), the court allowed the landowners a "reasonable time" to so perfect their rights. At the expiration of that period, which was tentatively fixed by the decree, any still unperfected rights were to be considered "waived and abandoned." The state engineer was directed to make a supplemental determination as to the extent of rights perfected at a specified deadline date, such date being subject to extensions granted by him for good cause shown. In the interim, the rights awarded landowners were to be deemed inchoate, or conditional

upon application of water to a beneficial use on appurtenant lands within the allowable time.

The Duffy Decree further provided that the aggregate number of acres of water rights awarded fixed the total amount and rate of water flow that COID could divert from the Deschutes River.

The decree was affirmed as modified by the Oregon Supreme Court in 1930. *In re Waters of Deschutes River,* 134 Or 623, 631-661, 699-701, 286 P 563, 294 P 1049 (1930), *appeal dismissed* 290 US 590, 54 S Ct 83, 78 L Ed 520 (1933). The modifications are irrelevant for our purposes herein.

After granting several extensions, the state engineer finally fixed June 30, 1950 as the deadline for perfecting inchoate water rights on lands within COID boundaries.

Following a field survey and other investigations, the state engineer filed a report entitled "Supplemental Findings of Fact and Order of Determination" on May 15, 1953. According to the report, some landowners had not beneficially applied water to the full extent of their inchoate rights. These landowners lost all water rights on land in excess of their irrigated acreage. Such losses throughout the district totaled 2,916 acres of water rights.

Other landowners had, however, irrigated a total of 2,314 more acres of their lands than they had inchoate rights. The amount of water delivered to each 40-acre tract was computed on the basis of the number of inchoate water rights which were recognized therein, which in turn had been determined by the number of acres in the tract considered irrigable. While each inchoate right was supposed to supply

the amount of water necessary to irrigate one acre of land, many farmers had "stretched," by conservation measures and geographic circumstance, the amount of water so allocated so that it in fact irrigated more than one acre of land. These acres being irrigated by "sharing" the water assigned to inchoate right lands had originally been considered non-irrigable, and thus had been sold under contract to the landowner or his predecessor for a very low price, without appurtenant water rights.

Vested water rights were not assigned to those acres irrigated with shared water in the state engineer's report, because there were no surplus inchoate rights in the respective 40-acre parcels to legitimatize such awards. Anticipating this, many landowners irrigating these acres without attached inchoate rights had, prior to the 1950 cutoff date, purchased unperfected inchoate rights from other landowners to "cover" such acreage.

Also not recognized in the report were all but 175.4 of 3,679.05 acres of water rights claimed by COID on district, state, and federal lands. Vested rights were denied due to a failure to apply water to beneficial use thereon.

Exceptions and objections were thereupon filed to the state engineer's report in Deschutes County Circuit Court. On September 30, 1958, Judge Ralph S. Hamilton handed down a supplemental decree.

The decree recited a stipulation whereby, in consideration of COID's abandoning its claim to the 3,679.05 acres of water rights denied it by the state engineer, other water claimants would not object to COID's being awarded 2,314 acres of rights. These

rights were to be appurtenant to the extra lands irrigated by "stretched" water, but in the name of Central Oregon Irrigation District. At trial in the present case, the state engineer testified that he knew of no other case where water rights had been assigned to a party other than the owner of the appurtenant land. His office did not object to the award, however, because the subject land had, in fact, been irrigated, and it was felt that the matter was one for the court to decide.

The supplemental water rights grant had the effect of increasing the total amount of water that COID was authorized to divert from the Deschutes River. COID distributed, and still distributes, this additional water to *all* landowners in the district, based on a proportional increase in the amount of water delivered per perfected inchoate right. In addition, system improvements have resulted in a gradual 20 per cent increase in water available to landowners since 1950.

COID assesses each member an annual fee per acre of water right for operation and maintenance of the irrigation system. From 1958 to 1971, the landowners were directly charged only for their inchoate rights as confirmed in the 1958 decree. Operation and maintenance expenses assessed for the supplemental rights awarded the district in 1958 were absorbed by the district itself, and the assessment rate per acre of water right was raised proportionately to cover this added expense.

In 1971, COID by mail advised its members who held lands as to which supplemental water rights were appurtenant, that the district planned to sell such rights. The letter stated:

"* * * * *

"The directors have never felt in a position to

sell the rights thru the intervening years since they feared that the constantly worsening condition of the Main Flume would cut the supply of water down to the point where they could no longer assure delivery of adequate water to the privately owned rights. Now the picture is changed. * * *

"* * * * *

"The Board of Directors is now offering to the persons upon whose lands the rights were found the first opportunity to purchase the rights so that they may actually own the amount of water rights which serve their crop land and so increase the value of their ranches.

"By Circuit Court decree your lands were found to have 160 acres of this water right. Price is set by the Board at $200.00 per acre of water right. This price is only for those upon whose lands the water right now lies, should you not wish to purchase the rights they will be offered to others but at a higher rate.

"* * * * *

"Since it is planned to place these water rights in private ownership by spring of 1972 the Directors ask that you take steps to purchase any water rights you may wish to acquire by Nov. 15, 1971. Should nothing be heard from you by that date they will assume they are free to offer the water rights, as listed above, to other interested parties."

At trial, plaintiffs, who own lands as to which COID supplemental rights are appurtenant, contended that a constructive trust should be impressed on the supplemental rights in their favor, and that said rights should be ordered transferred to them upon payment to COID of a per acre sum assertedly mandated by statute.

After hearing the testimony and examining the

voluminous documentary exhibits, the court upheld plaintiffs' contentions as follows:

"* * * * *

"1. The Central Oregon Irrigation District is in the nature of a cooperative and can have no separate and adverse interest apart from that of its users.

"2. As a result of its action in acquiring rights in its own name on water rights which had been developed by the owners of the land, the Central Oregon Irrigation District, holds such water rights as a constructive trustee for the owners on whose lands the water rights had been developed by themselves and their predecessors in interest. The Central Oregon Irrigation District in acting on behalf of the landowners had a continuing duty to protect their interests and to obtain for them as much water as possible.

"3. Upon the discovery of the excess acres which created the 'supplemental water rights,' the Central Oregon Irrigation District should have notified the landowners upon whose land these water rights had been developed and given them an opportunity to apply for a transfer of the unused rights which were being lost by the Central Oregon Irrigation District.

"4. By entering into the stipulation with the State Engineer and the other active participants in the adjudication of the waters of the Deschutes River, without notice to the landowners, the Central Oregon Irrigation District acted adversely to the interest of the landowners and, therefore, violated this confidential and fiduciary capacity.

"5. The act passed by the 1925 Oregon Legislature which is now incorporated into ORS 555.180 permits the purchase of rights for excess acres of water rights in situations such as exist in the present case. The district is given a lien upon the land for payments due for the costs of construction of the project for such rights. Upon payment of

this lien, the water rights are to be transferred to the landowners. Procedures for transfer are provided by ORS 555.180 and ORS 540.1451 [sic]. Price to be charged to the landowner cannot be greater than the price per acre as fixed by the State Engineer in 1925.

"6. $40.00 per acre is the per acre amount of these supplemental water rights for which the lien exists.

"7. Upon payment of this amount for each acre purchased, the supplemental water rights shall be transferred by the defendant, Central Oregon Irrigation District to the true owner.

"* * * * *."

On January 22, 1974, the court entered its decree as follows:

"* * * * *

"1. The defendant, Central Oregon Irrigation District, shall hold as constructive trustee for the benefit of the plaintiffs the 'supplemental water rights' described on Exhibit 'A' to this Decree.

"2. Defendant, Central Oregon Irrigation District, shall have a lien for $40 per acre upon said supplemental water rights and upon payment of said $40 per acre to the defendant, the defendant, Central Oregon Irrigation District, must transfer to the plaintiffs or their successors in interest those supplemental water rights as set forth in Exhibit 'A' hereto.

"3. Plaintiff shall have a judgment against the defendants for plaintiff's costs and disbursements necessarily incurred in the above entitled matter.

"* * * * *."

The Oregon Supreme Court, in *Marston v. Myers,* 217 Or 498, 342 P2d 1111 (1959), has defined a constructive trust as

"'* * * a trust by operation of law which arises contrary to intention and in invitum, against

one who, by fraud, actual or constructive, by duress or abuse of confidence, or by commission of wrong, or by any form of unconscionable conduct artifice, concealment, or questionable means, *or who in any way against equity and good conscience,* either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. It is raised by equity to satisfy the demands of justice.' 54 Am Jur, Trusts, 167, § 218." (Emphasis supplied.) 217 Or at 509.

*See also: Belton v. Buesing,* 240 Or 399, 409, 402 P2d 98 (1965) ; *Fouchek v. Janicek,* 190 Or 251, 261, 225 P2d 783 (1950).

In *Smith v. Enterprise Irrigation Dist.,* 160 Or 372, 85 P2d 1021 (1939), our Supreme Court stated:

"The relationship between an irrigation district and its constituent landowners as to the water rights and other property of such district is that of trustee and cestuis que trustent.

"As stated in a California case:

" 'The ultimate purpose of a district organized under the irrigation act is the improvement by irrigation, of the lands within the district. It can, under the law, be organized and exist and acquire property only for such purpose. This we think is so clearly apparent as not to require further discussion here. Such a district holds all property acquired by it solely in trust for such ultimate purpose, and can divert it to no other use.' *Jenison v. Redfield,* 149 Cal. 500, 87 P. 62, 64.

"The section of the California statute cited in support of the above quoted statement is merely a legislative declaration of the obvious effect of the irrigation act. In that regard, the context of the Oregon irrigation act is susceptible of no other construction although it contains no such express provision." 160 Or at 378-79.

Although defendant concedes in its brief that it stands in a fiduciary capacity to its members, some reference to the uncontroverted testimony evidencing the scope of the relationship is helpful in interpreting COID's conduct in acquiring the supplemental rights at issue herein.

Olaf Anderson, manager of the district from 1933 to 1955, testified that COID personally contacted each landowner prior to the 1950 deadline for perfecting inchoate rights to urge them to "prove up" all such tentatively recognized water claims.

George W. Brewster, now deceased, was the attorney for COID at all times material herein. From 1954 until 1969, now Circuit Judge John Copenhaver was his law partner and assisted him in his representation of the district. Judge Copenhaver testified that, during the 1954-58 period, a substantial number of landowners consulted their firm to discuss or have explained to them their water rights. Most of these landowners did not acquire independent counsel, and no such independent counsel appeared in the court proceedings. These people, plaintiffs among them, were advised as to the status of their water rights by Judge Copenhaver and Mr. Brewster, and Judge Copenhaver assumed that they acted on the basis of such advice. He further testified that the district filed a "considerable" number of objections to the determinations of the state engineer on behalf of the landowners.

Betty Stanard, who served as Assistant Secretary and later Secretary of COID during the 1953-58 period, testified to the effect that attorney Brewster filed the landowners' objections to the 1953 determination and represented them in court when hearings were held on these matters.

Such testimony and the correspondence between Brewster and the landowners reveal a situation whereby the water users placed total trust in the district and its legal resources to protect and further their individual rights to water.

Nevertheless, the district filed with the court a claim on its own behalf to the supplemental rights at issue herein in 1956.

Stanard, Anderson, Copenhaver, and Chris Wheeler, the state engineer, all testified that, to their knowledge, no notification was ever given to the landowners concerning the filing of said claim by the defendant district for water rights. appurtenant to lands they (the landowners) had developed. No landowners participated in the stipulation or legal proceedings which gave rise to these supplemental rights.

*Clough v. Dawson,* 69 Or 52, 133 P 345, 138 P 233 (1914), stated:

> "Every fiduciary relation implies a condition of superiority held by one of the parties over the other, and, in every transaction between them by which the superior party obtains a benefit, equity raises a presumption against its validity, and casts upon that party the burden of showing affirmatively its compliance with equitable requisites, thereby overcoming the presumption: 2 Pomeroy, Eq. Jur. (3 ed.), § 596." 69 Or at 60.

■ Defendant, undeniably the superior party in its relationship with the constituent landowners, made no showing whatsoever to rebut plaintiffs' contention that the plaintiffs received no notice of the supplemental rights adjudication. Plaintiffs' contention thus stands. Had plaintiffs been advised of the district's adverse supplemental claim, they could have retained their own

counsel and asserted their own claims. Instead, the district allowed these plaintiffs to believe that it was continuing to act in their interest, as had been the historical pattern, whereas, in fact, it was acting adversely to them.

■ Defendant also attacks the imposition of the constructive trust under the doctrine of res judicata.

The district correctly cites, among other authorities, *Adams v. Perry,* 168 Or 132, 111 P2d 838, 119 P2d 581 (1941), for the proposition that a water rights adjudication is an in rem proceedings, and the decree of the court therein is "conclusive as to all prior rights and the rights of all existing claimants upon the stream or other body of water lawfully embraced in the determination (ORS 539.200)." 168 Or at 145.

Neither those authorities nor ORS 539.200 are here controlling, however. In *Staub v. Jensen,* 180 Or 682, 178 P2d 931 (1947), the Supreme Court declared:

"* * * The water code does not seek to make an adjudication thereunder conclusive upon the rights of persons who have received no notice. * * *

"* * * * * *

"* * * [ORS 539.200] has been construed by this court as follows:

"* * * [That section] in effect declares a decree of the court confirming a determination of the board to be conclusive as to claimants *lawfully embraced in the determination.* This declaration precludes making such decree or order of determination binding and conclusive upon any except those upon whom service of notice has been made pursuant to the statute. * * *" (Emphasis in original.) 180 Or at 688-89.

Defendant next contends that it could not have

violated its fiduciary duty to plaintiffs in the manner alleged since plaintiffs could not have been awarded the supplemental rights in 1958, and thus had no interest in such rights worthy of invoking fiduciary responsibilities on the part of the district.

The district's argument in this regard is essentially twofold. It first posits that plaintiffs could not then have been awarded the supplemental rights because rights provided for in the original irrigation contracts established "in 1958 the measure of the adjudicated rights of private lands in the district," and plaintiffs in 1958 had no such inchoate rights appurtenant to the extra lands they had irrigated with shared water.

Defendant relies principally on *Central Oregon Irr. Co. v. Whited,* 76 Or 255, 142 P 779, 146 P 815 (1915), to support its contention. In that case, defendant landowner contended that he was entitled to water for all his land that was in fact irrigable by virtue of contracts involving himself, the development company, and the state, and that the company had failed to deliver such water. An early determination had been made by the company and the State Land Board that only 15 acres on each of the landowner's two 40-acre subsections were irrigable. This determination, and others like it, had subsequently been relied upon by the company in constructing the irrigation system. A later, more accurate survey of the area showed defendant landowner's tracts to contain 25 and 26 acres of irrigable land, respectively.

The Supreme Court made the following determination:

"* * * [The original estimate] was acted upon by the company in the construction of the canals

and works and in making the appropriation of the water necessary therefor. The application and agreement for the land and acceptance of a conveyance of the same were founded thereon. It is claimed that there are 3,400 acres of like excess acreage. The arrangement made cannot be disturbed without encroaching upon or at least menacing the rights of other water users. It may be that, after a large portion of the segregation has been irrigated for a time, a less amount of water will be required therefor, and an equitable allotment can be made so as to serve the land in dispute. In the present condition of the contracts and interests involved, the number of acres of irrigable land for which the defendant is entitled to water under the contract and the statute must be limited to 15 acres of each subdivision.

"* * * As we view the matter, a readjustment can only be made by agreement of the parties with the approval of the state land board. Stated in brief, the defendant's agreement has for its foundation the contract with the state. The list is made a part of the latter by virtue of the stipulations therein. All were given force by the statutes under which they were executed and carried out. * * *" 76 Or at 270-71.

■ This language hardly supports defendant's argument that the original contract water rights fix an absolute limit on the quantum of rights ever to become vested in the landowners. The crux of the *Whited* decision, in our view, is that, under the then existent conditions, the prayed-for increase in allowable water rights was, at the very least, premature and may well have been impractical. It is clear, however, that the court did not rule out the likelihood that adjustments could be made in the future.

Indeed, such adjustments were soon made. Under the Deitrich Decree, COID was empowered to sell

water rights to landowners for irrigable lands which they had purchased from the company (via payment of the reclamation lien) for the price applicable to non-irrigable lands. And in 1925 the 'legislature enacted provisions whereby a company supplying water could collect the "irrigable land" reclamation lien price from landowners who had actually applied water to lands they had bought for the "non-irrigable land" price, upon which payment the water rights to such lands were to stand confirmed in the landowner. Oregon Laws 1925, ch 142 (found today in original form at ORS 555.180-555.190).

We find nothing in the *Whited* decision barring the claim by plaintiffs to the supplemental rights at issue herein.

In addition, defendant strenuously argues that plaintiffs are precluded from claiming the supplemental rights because their irrigation of the acres appurtenant to those rights was illegally accomplished through the use of water allocated to other lands.

It is asserted by defendant that Oregon water law prohibits a landowner from conserving water that has been allocated to certain of his lands and with such excess irrigating other acreage. This proposition finds some support in our water code and case law. ORS 540.510; *Broughton v. Stricklin,* 146 Or 259, 28 P2d 219, 30 P2d 332 (1933); *Tudor v. Jaca,* 178 Or 126, 164 P2d 680, 165 P2d 770 (1945). *But see* ORS 555.180-555.190; Griffith, *Water Law—Conservation—Installation of Water-Saving Devices as a Means of Enlarging an Appropriation,* 46 Or L Rev 243 (1967).

Here, however, we do not reach this question. Assuming *arguendo* that plaintiffs, under the forego-

ing authorities, had no right to irrigate acreage other than that to which their inchoate rights were appurtenant, such has absolutely no effect on the equities of this case in the light of the 1958 decree. That decree reads, in part, as follows:

"* * * * *

"The Court finds that all the lands included and tabulated in Exhibit 15 [COID's claim for supplemental rights] were actually reclaimed and irrigated prior to June 30, 1950, and that said amended claim, together with all other rights claimed within the District heretofore or herein allowed, are less than the inchoate rights awarded by the Court to the District.

"* * * * *

"IT IS THEREFORE ORDERED that a right is allowed in the name of the District for the irrigation of 2,314 acres in accordance with the tabulation exemplified by the Central Oregon Irrigation District Exhibit 15 * * *.

"* * * * * "

Essential to the court's rationale for its awarding rights to the district was the fact that plaintiff-landowners had irrigated 2,314 acres in excess of their inchoate right entitlement. Thus, if plaintiffs unlawfully irrigated those extra acres, and by virtue of such unlawful irrigation were not entitled to an award of water rights appurtenant thereto, then the district had no better claim. Consequently, the district cannot be heard to argue that plaintiffs had no legitimate claim to the supplemental rights in 1958 when it, the district, sought to acquire those rights for itself in that litigation and still asserts its title to them in this case.

In *In re Waters of Deschutes River,* supra, 134 Or at 633, the Supreme Court declared:

"To constitute a valid appropriation of water

three elements must always exist: (1) An intent to apply the water to some beneficial use existing at the time or contemplated in the future; (2) a diversion from the natural channel by means of a ditch, channel or other structure; and (3) the application of it within a reasonable time to some useful purpose: *Low v. Rizor,* 25 Or. 551, 557 (37 P. 82); *Nevada Ditch Co. v. Bennett,* 30 Or. 59 (45 P. 472, 60 Am. St. Rep. 777)."

■ Plaintiffs have met the most basic prerequisites to a valid water right under the Oregon Water Code. However, they were denied the opportunity to lay claim to water rights appurtenant to the lands they irrigated because of defendant's failure to meet its fiduciary obligations. These, at a minimum, obliged it to inform plaintiffs that such rights were being asserted by the district for its own benefit. Such circumstances provide an appropriate basis for the impressing of a constructive trust, "a remedial institution invented by equity to avoid unjust enrichment in situations where there is no other available equitable remedy." *Belton v. Buesing,* supra, 240 Or at 409.

Too, this defendant asserts no countervailing equity. It urges that the award was a quid pro quo for the abandonment of its claim to water rights on 3,500 acres of district, federal, and state land. This claim was denied by the state engineer in his 1953 report because water had not been applied to beneficial use on such lands. The situation stands in stark contrast to the irrigation and development by plaintiffs of the lands at issue herein.

We find no error in the circuit court's imposition of a constructive trust in favor of plaintiffs upon the supplemental water rights appurtenant to their lands acquired by defendant district in 1958.

Defendant's next assignment alleges that plaintiffs are barred by laches. In the recent case of *Stephan v. Equitable S & L,* 268 Or 544, 522 P2d 478 (1974), the Supreme Court stated:

"In order to constitute laches there must have been full knowledge of all the facts, concurring with a delay for an unreasonable length of time, and laches does not start to run until such knowledge is shown to exist. *Wills v. Nehalem Coal Co.,* 52 Or 70, 89, 96 P 528 (1908); *Kelly v. Tracy,* 209 Or 153, 172, 305 P2d 411 (1956). In addition, the delay must result in substantial prejudice to the defendant to the extent that it would be inequitable to afford the relief sought against the party asserting laches as a defense. *Dahlhammer and Roelfs v. Schneider Exec.,* 197 Or 478, 498, 252 P2d 807 (1953); *Hanns v. Hanns,* 246 Or 282, 305, 423 P2d 499 (1967). Thus, the doctrine of laches is not an inflexible rule, but its application depends upon the particular circumstances of each case. *McIver v. Norman,* 187 Or 516, 544, 205 P2d 137, 213 P2d 144 (1949). See also *Willis v. Stager,* 257 Or 608, 618-19, 481 P2d 78 (1971)." 268 Or at 569.

Defendant had the burden of proving the prerequisites for invoking laches. *Hanns v. Hanns,* 246 Or 282, 305, 423 P2d 499 (1967). There was no evidence adduced at trial that, prior to defendant's letter of August 18, 1971, plaintiffs had any knowledge that the district was claiming the supplemental rights adversely to them. This suit was commenced on December 1, 1971. The assignment is without merit.

The defendant further challenges the price of $40 per acre fixed by the court to be paid by the plaintiff-landowners in exchange for the transfer to them by the defendant of the supplemental water rights.

ORS 555.180, first enacted in 1925, still reads as follows:

"Wherever an irrigation system has been constructed under contract with the State of Oregon pursuant to the Act of Congress known as the Carey Act, and under and pursuant to ORS 555.010 to 555.160, and it develops that the acreage of land actually irrigated in any smallest legal subdivision of the land is greater than the acreage made subject to the lien in the reclamation contract for said smallest legal subdivision and the waters for the excess acres actually irrigated in such legal subdivision over and above the amount fixed in the contract for lien have not as yet been paid for, nor the amount to be paid therefor agreed upon, the State Engineer upon request of the company supplying water to the excess acres shall notify the person using the water upon the excess acres to pay for the same or enter into an arrangement with the company furnishing the water providing for the price to be paid therefor and the manner of payment; *provided, the company furnishing the water shall not exact a price per acre for such excess acres greater than the price per acre as now fixed by the State Engineer.*" (Emphasis supplied.)

Defendant argues that "the statute, by its terms, is limited to the period of time in which water was distributed on the basis of irrigation contracts with Carey Act developers." We find no such limiting provision in ORS 555.180. This section is clearly dispositive of the legislative intent in circumstances such as those at bar. Accordingly, we deem it controlling.

Furthermore, we are satisfied from the evidence that the statutory "price per acre as now set by the State Engineer" was, at the time ORS 555.180 was enacted, $40 per acre. The 1907 and 1927 contracts referred to hereinbefore, together with the testimony of

the state engineer at trial, all support this conclusion. Additionally, the equities of this case convince us that the court correctly fixed the amount due the district for water rights at $40 per acre.

■ Defendant further contends that plaintiffs should be required to pay "their share" of the post-1958 improvements to the irrigation system, together with operation and maintenance charges from that date. Plaintiffs have never owned the supplemental water rights here in contention. From the time they were awarded to the defendant district in 1958, plaintiffs have benefited from such rights in no greater measure than have all other landowners within the district. By the same token, plaintiffs have paid their proportionate shares of operation and maintenance charges assigned to the supplemental rights, again on the same basis as all other COID landowners. The argument is without merit.

■ Finally, defendant seeks interest on the price for the supplemental water rights which plaintiffs are obliged to pay in order to acquire title thereto. Plaintiffs are, by this decree, only awarded the right to acquire certain supplemental water rights at a price of $40 per acre. Defendant district has never offered to sell such rights to plaintiffs, and has, by this appeal, effectively prevented acquisition by them on those terms, pending the outcome of this appeal. The defendant has thus, by its own conduct, foreclosed its claim to interest prior to the effective date of the decree.

Furthermore, ORS 555.130, 555.180, and 555.190[9]

---

[9] **ORS 555.190** provides:

"The notice given by the State Engineer shall be in writing and may be served by registered mail. If the user of the

provide mechanisms, including lien rights, whereby defendant may protect its interests in completing the sales provided for in the decree.

Affirmed.

---

water does not comply with the notice and either pay for the excess water or enter into a definite arrangement with the company for payment thereof within 30 days from the mailing of the notice, the State Engineer shall, upon notice from the company furnishing the water, cancel the right of the landowner to the excess acres and thereafter, without further application for permission so to do, the company furnishing the water may sell and deliver the water to other lands. Upon effecting the sale of the water to other lands the company shall notify the State Engineer of the lands to which the water is transferred."