146 July 15, 2020 No. 9

IN THE OREGON TAX COURT
REGULAR DIVISION

POWEREX CORP.,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 5339)

On cross-motions for partial summary judgment, Plaintiff argued that it was not a "public utility" and therefore Oregon's Uniform Division of Income for Tax Purposes Act "ultimate destination" sourcing provisions applied to its sales. After considering the text, context, and legislative history of the phrase "public use," the court concluded that a business is a public utility if the public has a right to buy or use the commodities or services provided by the business. Plaintiff was not a "public utility" under ORS 314.610(6) because no segment of the public acquired any such right against it.

Oral argument on cross-motions for partial summary judgment were held on September 9, 2019, in the courtroom of the Oregon Tax Court, Salem.

Eric J. Coffill, Eversheds Sutherland (US) LLP, Sacramento, filed the motion and argued the cause for Plaintiff Powerex Corp.

Marilyn J. Harbur, Senior Assistant Attorney General, Department of Justice, Salem, filed the cross-motion and argued the cause for Defendant Department of Revenue.

Decision rendered July 15, 2020.

**ROBERT T. MANICKE, Judge.**

This case involves Oregon corporation excise tax assessments against Plaintiff for the tax years ending March 31, 2011 through March 31, 2015 (collectively, the "Subject Years").[1] In prior litigation involving tax years ending in 2002 through 2004 (the "Prior Years"), both parties

---

[1] Federal income tax law, as incorporated by Oregon, generally allows corporate taxpayers to elect a tax year other than the calendar year. *See* Bittker & Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 5.07; ORS 314.085. References to the Oregon Revised Statutes (ORS) are to the 2009 edition unless otherwise indicated.

took the position that Plaintiff was within the class of tax-payers to which Oregon's version of the Uniform Division of Income for Tax Purposes Act (UDITPA) applied, and the Oregon Supreme Court and this court decided various issues relating primarily to whether Plaintiff's sales at wholesale of electricity and natural gas were "in this state" pursuant to Oregon's UDITPA.[2] *See Powerex Corp. v. Dept. of Rev.*, 357 Or 40, 346 P3d 476 (2015), *on remand*, 22 OTR 222 (2016). On cross-motions for partial summary judgment, this court now must decide whether Oregon's UDITPA applied to Plaintiff for the Subject Years, or whether Plaintiff instead was excluded as a "public utility." If Plaintiff was a public utility, the court must decide whether an administrative rule that Defendant adopted in 2015 causes Plaintiff's sales for the Subject Years to have been in Oregon. If Plaintiff was not a public utility under Oregon's UDITPA, Plaintiff prevails on its motion.

## I.   FACTS AND LEGAL BACKGROUND

During the Subject Years, as in the Prior Years, Plaintiff's principal business was the sale and purchase of wholesale electricity and natural gas in Canada and the United States. *See Powerex*, 357 Or at 42. Plaintiff was organized under the laws of British Columbia.[3] It is uncontested that, during the Subject Years, all of Plaintiff's sales of electricity and natural gas to purchasers in Oregon were at the wholesale level. Plaintiff did not possess any license issued by or for the State of Oregon for sales or delivery of electricity or natural gas to the public. Plaintiff did hold certain licenses and permits from Canadian and United States federal regulators to serve wholesale energy customers, including US Department of Energy Permits and US Federal Energy

---

[2] The court at times refers to "Oregon's UDITPA" when discussing the 1965 act, Or Laws 1965, chapter 152, in distinction to the uniform law template drafted by the National Conference of Commissioners on Uniform State Laws. The 1965 Oregon Legislative Assembly's few deviations from the uniform act are discussed below.

[3] The court notes that Plaintiff's incorporation outside the United States required it to compute its federal taxable income separately from its corporate parent or any other affiliate, precluded it from joining in a consolidated federal or Oregon return, and required that its Oregon taxable income be determined separately. *See StanCorp Financial Group, Inc. v. Dept. of Rev.*, 21 OTR 120, 125 (2013) (describing Oregon's "water's-edge" rule); ORS 317.715(3).

Regulatory Commission Market-Based Rate Authorizations. Plaintiff did not own or operate any equipment or facilities used for the production or storage of electricity or gas in Oregon, or sell or deliver, or offer for sale or delivery, any electricity or natural gas to any residential customers in Oregon. Plaintiff was not classified as a public utility by the Oregon Public Utility Commission, nor was it regulated as a public utility by the Oregon Public Utility Commission. Plaintiff was not forced or compelled to sell to anyone, including any member of the public in Oregon, by the operation of law or regulation or regulatory body, including the Oregon Public Utility Commission, and freely chose its customers for its sales of electricity and natural gas. Plaintiff did not, nor did it hold itself out as willing to, serve or make sales of electricity or natural gas to the public in Oregon. No member of the public in Oregon had a right, including a legal or regulatory right, to demand or receive purchases or delivery of electricity or natural gas from Plaintiff.

The Oregon Supreme Court has previously described Oregon's two separate statutory regimes for allocating and apportioning taxable income to Oregon. *See Powerex*, 357 Or at 42-43; *Crystal Communications, Inc. v. Dept. of Rev.*, 353 Or 300, 302-05, 297 P3d 1256 (2013). Oregon's UDITPA, codified in ORS 314.605 to 314.675, applies to the great majority of businesses but does not apply to a "public utility" or to a "financial institution," as those terms are defined in Oregon's UDITPA. *See* ORS 314.615; ORS 314.610(4), (6). Instead, special, generally industry-specific, administrative rules that Defendant adopts pursuant to ORS 314.280 apply to "[t]axpayers engaged in activities as a financial institution or public utility." *See generally* OAR 150-314-0062 to 150-314-0090. The opinions in *Powerex* as to the Prior Years focused on the Oregon UDITPA "sourcing" provisions in ORS 314.665, *i.e.*, the provisions for determining whether "sales" are "in this state" and thus are counted in the numerator of the sales apportionment factor, increasing the share of overall taxable income to which Oregon's tax applies.[4] The

---

[4] For the Prior Years, the sales factor was the most heavily weighted fraction, or "factor," of three factors used to determine the percentage of overall taxable income attributable to Oregon. *See Powerex*, 357 Or at 42-43 & n 2. For the Subject Years, the sales factor generally is the *sole* factor that determines the

Supreme Court applied the Oregon UDITPA sourcing provisions to all of Plaintiff's sales, noting:

> "Throughout this litigation, the Oregon Department of Revenue has taken the position that UDITPA governs the apportionment of Powerex's income. We accept that assumption for the purposes of deciding the department's claims on appeal. We express no opinion on whether ORS 314.280, if applicable, would lead to a different result."

*Powerex*, 357 Or at 42 n 1.[5] The Supreme Court determined that sales of electricity constituted sales of "tangible personal property" under the Oregon UDITPA binary system of classification for sourcing purposes, reversing this court's conclusion that those sales were of "other than *** tangible personal property," a category that generally includes sales of intangible property and sales of services. *See Powerex*, 357 Or at 56-73. The Supreme Court also determined that Oregon's UDITPA requires that sales of tangible personal property be sourced based on the "ultimate destination" of the property, and not based on the state where the seller and buyer agree that the property is "delivered." *See id.* at 51. The Supreme Court thus invalidated Defendant's administrative rule that applied to all Oregon UDITPA taxpayers selling natural gas and electricity, which defined such a sale as "in this state" if the "contracted point of delivery" was in Oregon. *See id.* at 55-56. On remand, this court concluded, based on UDITPA's "ultimate destination" principles, that none of Plaintiff's disputed sales were in Oregon because the ultimate destination of the sales was outside Oregon, generally California. *See Powerex Corp. v. Dept. of Rev.*, 22 OTR 222, 231 (2016).

---

percentage of taxable income attributable to Oregon. ORS 314.650. An exception allows certain "utilities" that provide electric power, gas and other listed commodities "through a permanent infrastructure of lines, mains and pipes" to elect to apply a three-factor apportionment formula, but that exception is not at issue here. *See* ORS 314.280(3).

[5] In the instant case, Plaintiff supplied a declaration of its chief financial officer, which Defendant has not contested, stating in part: "For [the Subject Years] Plaintiff filed its Oregon Corporation Tax returns as a taxpayer subject to [UDITPA], to apportion its income earned within and without Oregon. For all tax years prior to the [Subject Years], including tax years ending March 2002 through March 2011, Plaintiff filed its returns as a UDITPA taxpayer, and Defendant on audit never reclassified Plaintiff as a 'public utility' taxpayer under ORS 314.280 and ORS 314.610(6) for any of those prior tax years."

In 2015, during the proceedings in this court on remand as to the Prior Years, Defendant withdrew the electricity and gas sourcing rule that the Supreme Court had invalidated under Oregon's UDITPA. Defendant adopted a rule, solely for "public utilities," containing materially similar text, including a test for sourcing based on the "contractually specified point of physical delivery," pursuant to Defendant's authority under ORS 314.280. *See* OAR 150-314-0090; ORS 314.280(1). At some point before 2017, Defendant also determined that Plaintiff fit within the Oregon UDITPA definition of a "public utility" and, following an audit, in 2018 assessed a deficiency against Plaintiff for the Subject Years on the theory that Plaintiff's sales of natural gas and electricity were in Oregon because the "contractually specified point of physical delivery" of the gas and electricity was in Oregon.

Plaintiff now seeks summary judgment on several of its claims, asserting that (1) it was not a "public utility" during the Subject Years and thus was entitled to continue to apply the Oregon UDITPA "ultimate destination" sourcing provisions; (2) even if Plaintiff was a public utility, Defendant's 2015 rule applying the "contractually specified point of physical delivery" test to Plaintiff is invalid because of the way Defendant promulgated the rule; and (3) even if the 2015 rule was validly promulgated, Defendant cannot apply it to Plaintiff retroactively, under ORS 305.125 as well as due process and equal protection principles. Defendant has cross-moved for summary judgment with respect to the same claims.

## II.   ISSUES

(1)   Was Plaintiff a "public utility" within the meaning of ORS 314.610(6)?

(2)   If so, was Defendant barred from applying its 2015 administrative rule for the sourcing of sales of electricity and natural gas, either because Defendant promulgated the rule through an invalid process or because application of the rule to the Subject Years would violate statutory or constitutional limitations on retroactive rulemaking?

## III.   ANALYSIS

A.   *Was Plaintiff a public utility?*

The first issue requires the court to interpret the statutory term "public utility" as defined in ORS 314.610(6). To do so, the court examines the text of the statute, as well as its context including any relevant legislative history, resorting to maxims if necessary. *See State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009). During all of the Subject Years, and indeed since its adoption in 1965, the statute has read as follows:

> "'Public utility' means any business entity whose principal business is ownership and operation *for public use* of any plant, equipment, property, franchise, or license for the transmission of communications, transportation of goods or persons, or the production, storage, transmission, sale, delivery, or furnishing of electricity, water, steam, oil, oil products or gas."

ORS 314.610(6) (emphasis added). It is uncontested that Plaintiff held no plant or equipment in Oregon. The parties disagree whether, as to any other property Plaintiff may have held in Oregon,[6] Plaintiff owned or operated that property "for public use." Plaintiff argues that its activities—wholesaling electricity and gas to resellers of Plaintiff's own choosing—did not involve any "public use" of any of its property. Defendant contends that the fact that Plaintiff "is selling power for the *ultimate* use by the public" (emphasis added) brings Plaintiff's activities within the scope of the definition. The court begins with a textual analysis of "public use."

1.   *Text of Oregon's UDITPA definition*

The court first seeks to determine whether the 1965 legislature intended "public use" as a "technical term" with an established meaning. *See, e.g.*, *Comcast Corp. v.*

---

[6] The parties specifically disagree whether Plaintiff held any "licenses," within the meaning of ORS 314.610(6). Plaintiff asserts that the uncontested fact that it possessed no license issued by Oregon for sales or delivery of electricity or natural gas to the public is dispositive in Plaintiff's favor. Defendant argues that Plaintiff's recognition by the Federal Energy Regulatory Commission as a power marketer, along with Plaintiff's permits from the Bonneville Power Administration, satisfy the definition of a "license." The court's disposition below of the "public use" requirement makes it unnecessary to reach the "license" issue.

*Dept. of Rev.,* 356 Or 282, 296, 337 P3d 768 (2014) (deter-mining whether legislature used a "term of art"; applying any such "technical" meaning as an "exception" in lieu of "plain meaning" of a term). Defendant argues that the leg-islature intended "public use" as a single term consisting of "two words together" and refers to the edition of *Black's Law Dictionary* approximately contemporaneous with Oregon's adoption of UDITPA. The court interprets this as an argu-ment that the phrase as a whole had an established mean-ing as a legal term of art. Plaintiff does not specifically chal-lenge the notion that the legislature intended "public use" as a technical term; instead, Plaintiff rejects Defendant's defi-nitions as inapplicable and challenges Defendant's interpre-tation of them.

Defendant quotes two dictionary definitions, one of which the court finds useful:[7]

"Public use, in constitutional provisions restricting the exercise of the right to take private property in virtue of eminent domain, means a use concerning the whole com-munity as distinguished from particular individuals. But each and every member of society need not be equally inter-ested in such use, or be personally and directly affected by it; if the object is to satisfy a great public want or exigency, that is sufficient. Rindge Co. v. Los Angeles County, 43 S.Ct. 689, 692, 262 U.S. 700, 67 L.Ed. 1186. The term may be said to mean public usefulness, utility, or advantage, or what is productive of general benefit. Williams v. City of Norman, 85 Okl. 230, 205 P. 144, 148. But it is not synony-mous with public benefit. Ferguson v. Illinois Cent. R. Co., 202 Iowa 508, 210 N.W. 604, 606. It may be limited to the inhabitants of a small or restricted locality, but must be in common, and not for a particular individual. Pocantico

---

[7] The court finds inapposite Defendant's second quoted definition:

"In patent law, a public use is entirely different from a use by the public. Los Angeles Lime Co. v. Nye, C.C.A.Cal., 270 F. 155, 162. If an inventor allows his machine to be used by other persons generally, either with or without compensation, or if it is, with his consent, put on sale for such use, then it will be in 'public use' and on public sale. David E. Kennedy v. United Cork Cos., C.C.A.N.Y., 225 F. 371, 372. Experimental use is never 'public use' if con-ducted in good faith to test the qualities of the invention, and for no other purpose not naturally incidental. Union Sulphur Co. v. Freeport Texas Co., D.C.Del., 251 F. 634, 651."

*Black's Law Dictionary* 1395 (4th ed 1968). The court does not discuss this defi-nition further.

Water Works Co. v. Bird, 130 N.Y. 249, 29 N.E. 246. The use must be a needful one for the public, which cannot be surrendered without obvious general loss and inconvenience. Jeter v. Vinton-Roanoke Water Co., 114 Va. 769, 76 S.E. 921, 925, Ann.Cas. 1914C, 1029.”

*Black's Law Dictionary* 1395 (4th ed 1968).

The legal dictionary definition involves the law of eminent domain and identifies when a deprivation of property is for a “public use” as required by the takings clause of the state or federal constitution. The relevance of this definition to the concept of a public utility is obvious: On the same page of the same dictionary appears a definition of “public utility” that states in part: “[The term ‘public utility’] is *synonymous* with ‘public use,’ and refers to persons or corporations charged with the duty to supply the public with the use of property or facilities owned or furnished by them.” *Black's* at 1395 (emphasis added).[8] The connection between the two

---

[8] The full definition of “public utility” in the fourth edition of *Black's* reads:

“A business or service which is engaged in regularly supplying the public with some commodity or service which is of public consequence and need, such as electricity, gas, water, transportation, or telephone or telegraph service. Gulf States Utilities Co. v. State, Tex.Civ.App., 46 S.W.2d 1018, 1021. Any agency, instrumentality, business industry or service which is used or conducted in such manner as to affect the community at large, that is which is not limited or restricted to any particular class of the community. State Public Utilities Commission v. Monarch Refrigerating Co., 267 Ill. 528, 108 N.E. 716, Ann.Cas. 1916A, 528. The test for determining if a concern is a public utility is whether it has held itself out as ready, able and willing to serve the public. Humbird Lumber Co. v. Public Utilities Commission, 39 Idaho 505, 228 P. 271. The term implies a public use of an article, product, or service, carrying with it the duty of the producer or manufacturer, or one attempting to furnish the service, to serve the public and treat all persons alike, without discrimination. Highland Dairy Farms Co. v. Helvetia Milk Condensing Co., 308 Ill. 294, 139 N.E. 418, 420. *It is synonymous with ‘public use,’ and refers to persons or corporations charged with the duty to supply the public with the use of property or facilities owned or furnished by them.* Buder v. First Nat. Bank in St. Louis, C.C.A.Mo., 16 F.2d 990, 992. To constitute a true ‘public utility,’ the devotion to public use must be of such character that the public generally, or that part of it which has been served and which has accepted the service, has the legal right to demand that that service shall be conducted, so long as it is continued, with reasonable efficiency, under reasonable charges. Richardson v. Railroad Commission of California, 191 Cal. 716, 218 P. 418, 420. The devotion to public use must be of such character that the product and service is available to the public generally and indiscriminately, or there must be the acceptance by the utility of public franchises or calling to its aid the police power of the state. Southern Ohio Power Co. v. Public Utilities Commission of Ohio, 110 Ohio St. 246, 143 N.E. 700, 701, 34 A.L.R. 171.”

*Black's* at 1395 (emphasis added).

terms is further supported by contemporaneous treatises, which indicate that the core concept of a public utility commonly has involved both a taking *from* the company, in the form of rate regulation or other government control, as well as taking authority vested *in* the company by statute. As summarized in one such treatise:

> "[A]lmost any layman would immediately \*\*\* note the four duties common to public utility industries: (1) the duty to serve all comers, (2) the duty to render adequate service, (3) the duty to serve at reasonable rates, and (4) the duty to serve without unjust discrimination. He would also note that the right of entry into the industry and extension of facilities is controlled by public authority by means of a franchise or certificate of convenience and necessity. In the exercise of this right a public utility, like the government itself, has the right of *eminent domain*, that is, the right to take private property with compensation for a purpose deemed to be in the public interest. It also has the right to adequate compensation."

Eli Winston Clemens, *Economics & Public Utilities* 13 (1950) (emphasis in original); *see also* Francis X. Welch, *Cases and Text on Public Utility Regulation* 82 (1961) (summarizing public utility regulation as "the expression of the right of the public, through the state, to obtain adequate service, at reasonable rates from a responsible public utility agency, in return for a grant of authority to such agency to operate in a given territory"). Given the close relationship between "public use" and "public utility," and the fact that both terms had established legal definitions, the court agrees with Defendant that the Oregon legislature intended "public use" as a technical term when defining "public utility" in ORS 314.610(6).

    2.   *Meaning of technical term "public use"*

       The next question is what that term of art meant. Again the court agrees with Defendant that the definition of "public use" in *Black's* is an appropriate place to begin. *See Comcast*, 356 Or at 296 (referring, "for starters, at least," to legal dictionaries for meanings of legal technical terms). Defendant interprets "public use" as requiring only that Plaintiff's activities not be "a 'private affair,'" by which Defendant seems to mean "selling power to itself or another

related company for its own private use." Under Defendant's theory, Plaintiff's activity is for a public use if it "is selling power for *ultimate* use by the public" (emphasis added). The court finds Defendant's proffered interpretation of "public use" much broader than the dictionary definition. The dictionary definition refers to a "use concerning the whole community," a use that is "in common." As discussed below, some of the cases cited in the definition indicate that a key element of the term was that some segment of the public has a right in common to buy or otherwise acquire the electricity, gas or other commodity that the property being taken will produce. As described in the cases, the public right was against the public body or company supplying the commodity to the public. None of the cases cited in the *Black's* definition, however, involves a wholesaler or other third party furnishing commodities to the person supplying them to the public. The court now briefly reviews the cited cases.

The first cited case, *Rindge Co.*, involves Los Angeles County's taking of private land to build public roads. *Rindge Co. v. Los Angeles County*, 262 US 700, 42 S Ct 1922, 67 L Ed 1186 (1923). The specifics of the opinion shed little light on this case, as *Rindge Co.* did not involve a public utility.[9] However, the case does illustrate the concept that a public right is embedded within the meaning of "public use." The essence of a public road is that anyone is allowed to use it, and the resistant landowner who was compelled to cede a strip of land for its construction has no right to turn the public away. One of the next cases cited in the *Black's* definition describes the public right expressly,[10] in the context of a

---

[9] Although the proposed roads terminated entirely within private ranch land, at the Ventura County line, the Court concluded that a public use justified the eminent domain proceedings. The Court emphasized that the proposed roads would be accessible to the general public because one of the roads would immediately connect to an existing public road. Further, it was possible that Ventura County would someday decide to authorize its own new public roads to connect at the terminus. *Rindge Co.*, 262 US at 706-07.

[10] The first public utility case in the *Black's* definition does not address the concept of a right associated with public use. The dictionary cites *Williams v. City of Norman*, 85 Okla 230, 205 P 144 (1922) for the proposition that "public use" means "public usefulness, utility, or advantage, or what is productive of general benefit." The citation relates specifically to the court's extensive internal quotation of its earlier opinion in *State v. Millar*, 21 Okla 449, 96 P 747 (1908). Both cases involved municipal utilities. The issue in both cases was whether a city's constitutional authority to issue bonds to construct, own, and operate a "public

water utility. *Pocantico Water-Works Co. v. Bird*, 29 NE 246 (NY 1891), involved a privately owned company that sought to acquire riparian and other rights from landowners after contracting with a village to build and operate a dam and other facilities to supply the village with water. The court held that the company's acquisitions were for "public use." *Id.* at 248. The court concluded that, because the company had contracted with the village, "the inhabitants thereof have the right to [the] common use [of the water] *** ." *Id.*[11]

*Jeter* was another water works case, involving a corporation that was granted condemnation authority and a franchise to supply water to residents of a town and the neighborhood of the town. *Jeter v. Vinton-Roanoke Water Co.*, 114 Va 769, 76 SE 921 (1913). The court concluded that the corporation's acquisition of property was for a public use, summarizing the principle as follows: "The authorities also agree that if the property of a corporation is devoted to furnishing the general public or some definite portion of it with a public utility, and *the public has a definite and fixed use in the property which cannot be gainsaid or denied*, then the property is devoted to a public use *** ." 76 SE at 925-26 (emphasis added).[12] *Jeter* also referred to an earlier railroad case, stating: "'Where a use is public, a trust attaches to the subject condemned for the benefit of the public, of the enjoyment of which it *cannot be deprived by the company without reasonable excuse*, and the state retains the power to regulate and control the franchise and to fix rates.'" *Id.* at 925

---

utility" applied to certain public works projects: an electricity plant in *City of Norman* and a sewer works in *State v. Millar*. The court in each case had no difficulty concluding that the project would constitute a public utility as "conducive to the health, comfort, and convenience of the inhabitants of a city or town." *Millar*, 96 P at 753; *see City of Norman*, 205 P at 148.

[11] To the point cited in *Black's*, the court specifically noted that, although "public use" "implies 'the use of many,' or 'by the public,' *** it may be limited to the inhabitants of a small or restricted locality, but the use must be in common, and not for a particular individual." *Id.*

[12] The court quoted the California Supreme Court:

"'The right of an individual to a public use of water is in the nature of a public right possessed by reason of his status as a person ·of the class for whose benefit the water is appropriated or dedicated. All who enter the class may demand the use of the water, regardless of whether they have previously enjoyed it or not.'"

*Jeter*, 76 SE at 927 (quoting *Hildreth v. Montecito Creek Water Co.*, 139 Cal 22, 30, 72 P 395 (1903)).

(quoting *Zircle v. Southern Ry. Co.*, 102 Va 17, 21, 45 SE 802 (1903) (emphasis added).[13]

By contrast, in the remaining case cited in the dictionary definition, the court found that "public use" was lacking where a state tribunal, the Board of Railroad Commissioners (board), purported to set the rent that a railroad could charge to an individual who leased land from the railroad for the purpose of operating a coal storage shed. *Ferguson v. Illinois Cent. R. Co.*, 202 Iowa 508, 210 NW 604 (1926). The individual used the shed to sell coal "to his customers." 210 NW at 607. The court invalidated the board's order, concluding that it constituted a taking for private use. *Id.* The court contrasted cases involving grain elevators and warehouses because in those cases "grain was received indiscriminately from the public for storage at great terminal centers." *Id.*; *see Munn v. Illinois*, 94 US 113, 121, 24 L Ed 77 (1876) (noting that warehousemen, "[l]ike common carriers, \*\*\* are required by law to receive grain from all persons, and store the same upon equal terms and conditions"). As in *Pocantico Water-Works* and *Jeter*, the court stated as a general proposition: "The term 'public use,' as employed in the constitutional provision, does not mean a use which may properly be deemed a public benefit or advantage, but it means that the public possesses, to some extent, certain rights to the use of [*sic*] employment of the property." *Ferguson*, 210 NW at 606.

Based on the dictionary definition and the cases cited there,[14] the court concludes that the Oregon legislature

---

[13] As to the requirement that the use be "needful," as referred to in the dictionary citation, the court emphasized that furnishing water promotes "the health and comfort of the people" and is "indispensable to meet industrial progress, new conditions, etc." *Id.* at 926. The court rejected the contention that the existing water supply was adequate and that the only reason for the condemnation was to secure additional supply to serve a railroad customer. The court reasoned that the company had the same duty to supply the reasonable demands of a railroad customer as to serve private individuals. *Id.* at 927.

[14] The court also has examined a second legal dictionary in existence in 1965 but found no material difference in the definition or the cases cited there. *See* John Bouvier, *Bouvier's Law Dictionary* 1003 (1934) ("PUBLIC USE. Under Eminent Domain. Implies the use of many, or by the public. It may be limited to the inhabitants of a small or restricted locality, but must be in common, and not for a particular individual. Lewis, Em. Dom. c. 7; 180 N. Y. 249; 62 Cal. 182; 66 Hun 619. It arises when the sovereign power is essential to an enterprise, and is for that reason therein exercised; 50 Fed. Rep. 812." (Uppercase in original.)).

would have intended "public use" to apply to the activities of business entities that were obligated to sell, deliver or furnish any of the listed commodities or services to anyone fitting within a defined segment of the public. An entity that could freely choose its customers would not be considered to own and operate its property for public use. In this case, Defendant does not contest Plaintiff's factual assertions that it "was not forced or compelled to sell to anyone, including any member of the public in Oregon," that it "freely chose its customers," and that "no member of the public in Oregon had a right *** to demand or receive purchases or delivery of electricity or natural gas from Plaintiff." The court tentatively concludes that Plaintiff did not own or operate property for public use, subject to any new insights that the statutory context and legislative history might provide.

    3.  *Context*

         The context in which the legislature used the term "public use" includes the statutory framework, Oregon cases and administrative determinations, and cases from other states of which the legislature is considered to have been aware. *See Powerex Corp. v. Dept. of Rev.*, 357 Or at 62 (examining context of "tangible personal property"). The court has found no other occurrence of "public use" in the Oregon income tax statutes as of 1965. The exact term did not appear in the contemporaneous statute defining "public utilities" for regulatory purposes, although that statutory definition did include a requirement that the commodity or service be delivered or furnished "directly or indirectly to or for the public."[15] (The court briefly discusses other

---

[15] ORS 757.005(1)(a) (1963) provided:

"[T]he term 'public utilities' means: Any corporation, company, individual, association of individuals, or its lessees, trustees or receivers that owns, operates, manages or controls all or a part of any plant or equipment in this state for the conveyance of telegraph or telephone messages, with or without wires, for the transportation of persons or property by street railroads or other street transportation as common carriers, or for the production, transmission, delivery or furnishing of heat, light, water or power, *directly or indirectly to or for the public*, whether or not such plant or equipment or part thereof is wholly within any town or city."

(Emphasis added.) Section 2 of the statute excluded:

    "(a) Any plant owned or operated by a municipality.

    "(b) Any railroad, as defined in ORS 760.005 and 760.010, or any industrial concern by reason of the fact that it furnishes, without profit to itself,

elements of the Oregon public utility law below in reviewing the legislative history of ORS 314.610(6).)

The court now turns to cases that the parties cited in their briefings on the meaning of "public use." The court notes that the parties have presented no cases from Oregon or other states—and the court has found none—that specifically address "public use" as that phrase is used in the UDITPA definition.

a.   Cases and other authorities as of 1965

Plaintiff has identified four Oregon authorities addressing whether commodities were furnished for public use. Defendant nowhere discusses these Oregon authorities. In *Central Or. Irr. Co. v. Public Serv. Com.*, 101 Or 442, 196 P 832 (1921), the court concluded that the use of irrigation water was not a "public use," where the users were limited to certain "settlers" as prescribed by the 1894 federal appropriations provision commonly known as the Carey Act. *See* 43 USC § 641 *et seq* (codifying, as amended, chapter 301, section 4, 53 Congress, 28 Stat 372-73 (1885-1895) (1894)). The Carey Act imposed requirements of citizenship and minimum age on persons wishing to become settlers on certain desert land that Congress granted to the state in order to promote its reclamation. The state required prospective settlers to apply to purchase tracts of the land. Separately, the state contracted with the plaintiff company to build, operate and maintain an irrigation system on the land. The state required settlers buying the land to also contract with the company to pay one-time "reclamation" fees and annual "maintenance" fees in fixed dollar amounts as provided in the company's contracts with the state. Disputes arose between the plaintiff company and water users regarding whether the maintenance fee could be increased, and whether the Public Service Commission had jurisdiction to decide that issue. *Central Or. Irr. Co.*, 101 Or at 450-53.

The company argued "that it is a public utility, that the use of the water by the 'settlers' is a public use, and that their contracts come under the terms and provisions of 'The

---

heat, light, water or power to the inhabitants of any locality where there is no municipal or public utility plant to furnish the same."

ORS 757.005(2) (1963). The 1965 legislature made no change to ORS 757.005.

Public Utilities Act.'" *Id.* at 456. The court accepted this framing of the issue but held that there was no public use of the water because "the right of a contract to purchase and acquire title to land is confined and limited to a certain specified class of persons, and *** is not inherent in the 'settlers,' and does not exist as a matter of public right." *Id.* at 460-64.[16]

Plaintiff's next case is a federal case decided under Oregon law, *De Pauw University v. Public Service Commission*, 247 F 183 (D Or 1917). The *De Pauw* plaintiffs, bondholders in a company that owned an irrigation system, sued to restrain the Public Service Commission from reducing the water rates that the company charged. The company and its predecessor had acquired a large tract of land in Douglas County, and had sold off parcels pursuant to contracts that also provided for furnishing of water at specified rates, which the purchasers later complained were "exorbitant." 247 F at 185. In a ruling on a preliminary motion, the court concluded: "[I]t is clear to my mind that [the Oregon Public Utilities Act] can only apply to such companies as are engaged in the *general sale or rental of water to all who may apply for it within a given area*, and not to a private corporation that has no dealings with the public, but which merely undertakes to furnish water in fulfillment of private contracts made with certain individuals selected by it." *Id.* (emphasis added). Consistent with that ruling, in a later opinion following a trial, the court held that the Public Service Commission lacked jurisdiction, stating:

> "The evidence as taken on the trial shows clearly that neither the plaintiff nor its predecessors in interest were ever engaged in the business of selling or furnishing water to all who might apply within a given area, nor did either of them ever hold themselves out as ready and willing to do so. They were engaged in selling their own land, agreeing to furnish water on certain terms and conditions to the purchasers, and no others. They merely undertook to furnish water in fulfillment of a private contract with certain

---

[16] The court noted that the parties had stipulated that the plaintiff company also engaged in supplying water for use in certain cities, but the court stated that the question whether the company was a public utility as to those activities had not been presented. *Central Or. Irr. Co.*, 101 Or at 465. The court also noted that the contract between the state and the plaintiff's predecessor provided for eventual transfer of the irrigation system to a water users' association to be owned by all the settlers. *Id.*

individuals selected by them, and not to the public generally, and therefore were not public utilities, and subject to the jurisdiction of the Public Service Commission."

*De Pauw Univ. v. Pub. Serv. Commission*, 253 F 848, 849-50 (D Or 1918).

Plaintiff also cites two opinions of the Oregon Attorney General. In a 1926 opinion, the Attorney General relied on *Central Oregon Irrigation Co.* and *De Pauw* in concluding that water distribution rights granted as part of a land sale contract were not for a "public use." *See* 12 Op Atty Gen 510 (1926) ("the essential features of a public use being that it shall not be confined to the privileged individuals, but open to the indefinite public"). In 1951, the Attorney General examined the statutory definition of "public utility" in the context of telephone companies. Quoting from a legal reference work, the opinion states that "'public utility' implies a public use and service to the public \*\*\*." 25 Op Atty Gen 145, 1951 WL 46057 (1951) (quoting 43 Am Jur 571, § 2). The Attorney General opined that

"[t]he essential element \*\*\* is the holding out by the company of its willingness to serve an indefinite public, or a part thereof, which public has a right to demand or receive the services. \*\*\*

"\* \* \* \* \*

"\*\*\* [I]f the organization does not hold itself out as willing to serve the public as a class, or a part thereof, and it merely offers to serve only particular individuals of its own selection, then such organization is not a public utility."

*Id.* at \*1-2.

These Oregon cases and opinions provide strong contextual evidence that the 1965 Oregon legislature generally would have considered a business owning and operating property for "public use" to refer to a business from which at least some segment of the indefinite public had a right to demand the commodity the business offered. A business that sold only to particular customers "of its own selection" generally would not have been considered to operate property for public use. The court finds nothing in this context that changes its tentative conclusions based on the plain meaning of the technical term "public use."

Defendant presents a number of authorities from other states. The court begins with the three that had been decided as of 1965, as those opinions supply additional context that may give insight on the Oregon legislature's use of the term. Of these, the first two do not involve wholesaling and add nothing to the principles discussed above. *Inland Empire Rural Electrification, Inc. v. Department of Public Service of Washington*, 199 Wash 527, 92 P2d 258 (1939); *Rural Electric Co. v. State Board of Equalization*, 57 Wyo 451, 120 P2d 741 (1942).

*Inland Empire* involved a nonprofit corporation founded by a group of farmers to generate and distribute electricity to its members at cost. It was financed by the federal Rural Electrification Administration. The court found that the company functioned on a cooperative basis. There was no evidence that it had "dedicated or devoted its facilities to public use, nor has it held itself out as serving, or ready to serve, the general public or any part of it." 199 Wash at 539. Accordingly, the court held that the corporation was not a public utility. Defendant cites the opinion for its statement that "[t]he test to be applied is whether or not the corporation holds itself out, expressly or impliedly, to supply its service or product for use either by the public as a class or by that portion of it that can be served by the utility, or whether, on the contrary, it merely offers to serve only particular individuals of its own selection." (Quoting 199 Wash at 537.) This court concludes that both the holding and the quoted test align with the dictionary definition of "public use" and do not alter the court's tentative conclusion.

*Rural Electric Co.* involved a Wyoming statute that imposed an excise tax on amounts paid to "public utilities," defined by reference to the public utility act as companies "furnishing to or for the public" electricity and other listed commodities. The plaintiff company argued that it was not a public utility, and that the tax therefore did not apply to amounts paid to it, because it was organized as a membership corporation, not for gain, and sold electricity only to its members. 120 P2d at 743. The court found, however, that the company's membership base amounted to approximately 2,000 individuals, and that the company had a monopoly in the rural parts of the territory it served. *Id.* at 751. The

company, therefore, was a public utility because it served "a substantial portion of the public"[17] within the meaning of other cases discussing mutual and cooperative companies serving a small customer base. *Id.*[18] Defendant relies on *Rural Electric Co.* for the principle that "'The public does not mean everybody all the time.'" (Quoting *Terminal Taxicab Co. v. Kutz*, 241 US 252, 36 S Ct 583, 60 L Ed 984 (1916), in *Rural Electric Co.*, 120 P2d at 749.) However, this proposition is already contained in the definition in *Black's*, which states: "But each and every member of society need not be equally interested in such use, or be personally and directly affected by it. \*\*\* It may be limited to the inhabitants of a small or restricted locality, but must be in common, and not for a particular individual."[19] By contrast, the uncontested facts in this case are that "no member of the public in Oregon had a right, including a legal or regulatory right,

---

[17] Defendant states in briefing that "[t]he number of customers an entity has was not a criteria for determining whether the entity was a public utility." This court disagrees. The *Rural Electric Co.* court took pains to tally the number of members (180), then to estimate an average family size per member (4), and finally to make the factual assumption (without citing any evidence in the record) that the company served an equal population in two adjoining states. 120 P2d at 751. The court appeared to rely on the result of that calculation ("approximately 2,000 people") in reaching its conclusion that the company "serves a substantial portion of the public." *See id*.

[18] In its reply, Defendant also includes a lengthy quotation, which it misattributes to the Wyoming Supreme Court, reading in part: "What appellant seeks to do is to pick out certain industrial consumers in select territory and serve them under special contracts to the exclusion of all others except such private or domestic consumers as may suit its convenience and advantage." This quotation actually is from *Industrial Gas Co. v. Public Utilities Commission of Ohio*, 135 Ohio St 408, 412-13, 21 NE2d 166 (1939). That case involved a corporation that originally was a regulated utility but changed its articles of incorporation and sought to withdraw from regulation as a public utility. It continued to operate a 50-mile pipeline and distribution network in four counties, entering into contracts to supply gas to 19 industrial customers and refusing service to others. In holding that the company was a public utility, the court concluded that the company operated in a "substantial part of the state" and remained within the definition of a "public utility" notwithstanding its attempt to withdraw. *Industrial Gas Co.*, 135 Ohio St at 412.

[19] In *Terminal Taxicab*, the Court made the quoted remark in opining that a taxi company acted as a public utility in the portion of its business that involved fulfilling contracts with hotels to furnish enough taxis within certain hours to reasonably meet the needs of the hotels. The Court noted the many variables that might prevent the company from serving any particular customer but concluded that the taxi company's "service affects so considerable a fraction of the public" that it was correctly classified as a public utility. *Terminal Taxicab*, 241 US at 254-55.

to demand or receive purchases or delivery of electricity or natural gas from Plaintiff."

The first case that Defendant cites regarding wholesale activities is *Dairyland Power Cooperative v. Brennan*, 248 Minn 556, 82 NW2d 56 (Minn 1957). Dairyland was a nonprofit cooperative association whose members were exclusively other cooperatives, commercial public utilities and municipalities. It was "organized primarily to serve as a corporate vehicle in performing the specialized function of furnishing at wholesale electric energy to member cooperatives who in turn distribute the energy at a lower voltage to ultimate consumers." *Dairyland*, 248 Minn at 558. It sold electricity only to its member cooperatives and thus had no individual or ultimate consumers. *Id.* When Dairyland sought to condemn property to expand its facilities, the property owners challenged Dairyland's status as a public utility, arguing that the "general public must have a definite and established right to use of the property appropriated, not as a matter of favor or by consent of the owner, but as a matter of right ***." *Id.* at 560. Because Dairyland was obligated by its articles of incorporation to sell electricity only to its members, the property owners claimed that the requisite public use was absent, and that Dairyland could not be a public utility. *Id.* at 561.

The court, however, found that "the established policy and consistent practice of Dairyland has been to extend electric service to all distribution rural electric cooperatives within its service area and to accept without discrimination applications for membership from all such cooperatives which desire and need the service." *Id.* at 562-63. The member cooperatives themselves were under contractual obligations with the United States to extend electricity service to "all unserved persons" within their service areas. *Id.* at 563. Based on these facts, and based on Dairyland's role as a major regional power producer on which its members depended for supply, the court held that Dairyland had eminent domain authority and was "subject to the implied obligation to make membership available without arbitrary or unreasonable limitation to all coming within the purview of the purpose for which it is created." *Id.* at 568-69.

Defendant cites *Dairyland* for the proposition that the mere fact that a business sells a commodity at wholesale does not mean that its property is not put to a public use. As the court stated: "the fact that [Dairyland] does not directly come in contact with the ultimate consumer does not deprive it of its character as a public utility." *Dairyland*, 248 Minn at 568. Given the facts in *Dairyland*, this court finds the holding and reasoning in that case unsurprising; however, those facts are so different from those in this case that this court takes little from the opinion except the bare proposition that Defendant offers. It may be reasonable to extend the concept of "public use" to a cooperative that does not sell its commodity to the public but is formed by and composed of other cooperatives and obligated to sell to those members, which do sell to the public. This is particularly understandable when the top-tier cooperative has a policy and practice of making membership—and thereby its service—available to all cooperatives and municipalities that apply. However, the case has no practical application to the instant case, in which Defendant never contests that Plaintiff "freely chose its customers," or that "no member of the public in Oregon had a right, including a legal or regulatory right, to demand or receive purchases or delivery of electricity or natural gas from Plaintiff."

Defendant's next wholesaling case is *Western Colorado Power Co. v. Public Utility Commission*, 159 Colo 262, 411 P2d 785 (1966), decided one year after the Oregon legislature adopted ORS 314.610(6). In that case, the Colorado-Ute Electric Association, Inc. (Colorado-Ute), like Dairyland, was a rural electric cooperative engaged in generating and transmitting electricity as a wholesaler to its members.[20] *Western Colorado*, 411 P2d at 787. The court's opinion implies that all of Colorado-Ute's members were other cooperatives, except the Salt River Project Agricultural Improvement and Power District, which was a "quasi-governmental organization." *Id.* Colorado-Ute already operated within Colorado and sought to build a new power plant known as the Hayden plant, allowing Colorado-Ute to serve an expanded territory

---

[20] As part of its proposal before the court, Colorado-Ute also would have distributed electricity to the federal Bureau of Reclamation, a nonmember. *Id.* at 787-88.

within and without Colorado, including customers then sup-
plied by other sources. *Id.* at 788-89. Two public utilities in
Colorado opposed Colorado-Ute's proposal. One issue was
whether a state law allowing the public utilities commis-
sion to regulate Colorado-Ute as a public utility violated the
state or federal constitution. *Id.* at 794. The 1961 legislature
had amended the public utility law by expressly declaring
wholesaling of electricity by a cooperative to its members to
be an activity subject to regulation as a public utility, add-
ing the following provision:

> "Every cooperative electric association, or nonprofit electric
> corporation or association, and every other supplier of elec-
> trical energy, *whether supplying electric energy for the use
> of the public or for the use of its own members*, is hereby
> declared to be affected with a public interest and to be a
> public utility and to be subject to the jurisdiction, control,
> and regulation of the commission and to the provisions of
> articles 1 to 7 of this chapter."

Colo Laws 1961, ch 198, § 1 (amending CRS 11513) (empha-
sis added). Colorado-Ute had admitted in its application to
construct the Hayden plant that it was a public utility, and
both of the utilities opposing the construction in the case
before the court also agreed that Colorado-Ute was a public
utility. *Western Colorado*, 411 P2d at 795. The court cited
five decisions of other courts, stating: "There is an abun-
dance of authority to support the classification of a whole-
saler of energy to distributors as a public utility." *Id.*[21] The

---

[21] Although Defendant discusses none of the five cases, the court notes that
each one was readily distinguishable from the instant case: either state law
defined the company's wholesaling activities as those of a public utility (or granted
the company eminent domain authority), or the company's activities apart from
wholesaling caused it to be classified as a public utility. *See North Carolina Public
Service Co. v. Southern Power Co.*, 282 F 837 (4th Cir 1922) (electricity generation
and wholesaling company held eminent domain authority under state law, sought
to sell to its distribution affiliate at lower rates than to a competing independent
distribution company; *held* company required to sell to independent distribution
company at nondiscriminatory rates); *Boone County Rural Electric Membership
Corp. v. Public Service Commission of Indiana*, 239 Ind 525, 159 NE2d 121 (1959)
(plaintiff contested proposed electricity rate increase by its supplier, Public
Service Commission of Indiana, Inc.; no dispute that the supplier was a public
utility subject to rate regulation; *see* 1951 In Laws, ch 161, § 1); *Orndoff v. Public
Utilities Commission*, 135 Ohio St 438, 21 NE2d 334 (1939) (natural gas producer
selling to gas distribution company held a public utility under statute defining
"public utility" to include anyone "engaged in the business of supplying natural
gas *to gas companies*" (emphasis added)); *Industrial Gas Co.* (discussed above);

court held that the act did not violate the state constitution, stating:

> "[Colorado-Ute] furnishes electrical energy which is used by countless consumers in a very large segment of this state. The widespread interest of the public is clearly shown, and this court should not declare the legislative act to be void, especially when the parties themselves admit that it is valid and enforceable."

*Id*. Accordingly, the court upheld Colorado-Ute's status as a public utility.

Ignoring the fact that *Western Colorado* had not been decided when the Oregon legislature adopted ORS 314.610(6), the court does not find the case or its reasoning enlightening on the question in this case. Colorado-Ute, like Dairyland, was a cooperative composed of and selling to other cooperatives and public entities. Colorado-Ute also was squarely classified as a public utility under state law and had freely described itself as a public utility. In the instant case, by contrast, there is no evidence that Plaintiff has ever held itself out as a public utility or that the state has defined it as such for regulatory purposes.

b.   Defendant's post-1965 cases

Because the court's immediate task is to examine ORS 314.610(6) in the context of cases decided at enactment, the court perhaps could stop here. However, Defendant also argues that the 1965 legislature "likely intended the term 'public utility' not to be a static definition, but rather to be broad and flexible enough to adjust to changing circumstances as new electricity and natural gas sales possibilities were developed (*e.g.*, wholesale sales)." Without deciding whether the legislature had this intention, the court first reiterates that the string of five cases cited in *Western Colorado* clearly shows that the general concept of wholesale sales of electricity, gas and other commodities was not "new"

---

*Wisconsin Traction Light, Heat & Power Co. v. Green Bay & Mississippi Canal Co.*, 188 Wis 54, 205 NW 551, 555 (1925) (canal operator already leasing a hydroelectric plant to a city at rental rate based on electric output, now proposing to generate and sell electricity at wholesale, was within definition of "public utility," defined to include a corporation furnishing "power either directly *or indirectly*, to or for the public." (Emphasis added.)).

in 1965. (Most of those cases date to the 1920s and 1930s.[22])
Nevertheless, the court now pauses to discuss the two later
wholesaling cases that Defendant cites.

In *Independent Energy Producers Assn., Inc. v. State
Board of Equalization*, 125 Cal App 4th 425, 22 Cal Rptr 3d
562 (2004), the court held that independent electricity gener-
ation companies that sold electricity pursuant to long-term
contracts were "public utilities" for purposes of California's
centrally assessed property taxation regime. The court con-
sidered it irrelevant that the companies were not regulated
as utilities. 125 Cal App 4th at 448. The court primarily
examined whether the companies, as private businesses,
had undertaken a "dedication to public use" as determined
under longstanding case law.[23] *Id.* at 442-43. The court
stated the test as: "The essential feature of a public use is
that it is not confined to privileged individuals, but is open to
the indefinite public. It is this indefiniteness or unrestricted
quality that gives it its public character." *Id.* at 443 (inter-
nal references omitted). The court noted that many of the
facilities had been constructed with the assistance of public
funds and commitments from public agencies, and that all

---

[22] Defendant presents at some length a narrative on the creation of the
Intertie starting in the mid-1960s and the subsequent development of long-
distance power transmission, which Defendant asserts enabled the wholesale
sale of electricity on a large scale. In that portion of its brief, Defendant repeat-
edly urges the court to read the definition of "public utility" expansively, to cap-
ture activities that the legislature could not have foreseen in 1965. Nowhere,
however, does Defendant explain what the facts it proffers have to do with the
requirement of a public right when evaluating whether wholesaling of electricity
or gas constitutes a "public use." The court cannot simply ignore the term "public
use," reset its focus on the broader term "public utility," and resort to a general
maxim of determining "how the legislature would have intended the statute be
applied, had it considered the issue." *See Carlson v. Meyers*, 327 Or 213, 225, 959
P2d 31 (1998).

[23] Plaintiff seems to assert that California's constitutional provision requiring
central assessment defines a public utility as a person furnishing power "directly
or indirectly" to or for the public. That is not literally correct; the central assess-
ment clause does not use the phrase "directly or indirectly" to define the compa-
nies subject to central assessment. *See* Cal Const, Art XIII, § 19. A definition of
"public utility" does appear in the article governing public utilities for regulatory
purposes, and that definition does state that a person operating a plant for the
furnishing of power "directly or indirectly to or for the public" is a public utility.
*See* Cal Const, Art XII, § 3. The *taxing authority* in *Independent Energy Producers*
apparently felt it appropriate to bridge the gap, applying a "directly or indirectly"
test, as shown by a passage of findings that the court quoted (reproduced in part
above). *See Independent Energy Producers*, 125 Cal App 4th at 443-44.

had been constructed after site certification and regulation by the California Energy Commission. *Id.* The court also relied on findings by the taxing authority:

> "In the Board's view, there is no question that the generation facilities that would be [centrally] assessed under the amended Rule will produce, generate, and/or transmit power *directly or indirectly* to the public. For example, we are advised by the staff of the California Energy Commission that approximately 90% of the available generation capacity of the plants subject to the long-term contracts with [the California Department of Water Resources] are covered by the contracts. That power was purchased by a public agency on behalf of the public for transmission to the public. Other generation facilities in question are operated for the purpose of selling electricity in the competitive public marketplace. The other facilities must use the statewide grid to sell their power to the public."

*Id.* at 443-44 (emphasis added). The court found that the companies "submit[ted] no evidence" to show that they had not dedicated their property to the public, nor did they explain why the evidence that the taxing authority relied on was insufficient. *Id.* at 444.

Although wholesaling of electricity was one activity in which at least some of the companies in *Independent Energy Producers* engaged,[24] this court cannot rely on the opinion to conclude that a wholesaler of electricity (or gas) *necessarily* dedicates its property to a public use. First, all of the companies also owned or operated the electricity generation facilities that created the electricity that the companies sold at wholesale. As the court noted, some of those facilities had been constructed with public funds, and all had been constructed under close state regulation. Second, many of the companies' sales were pursuant to long-term contracts,[25] and nearly all of those sales were to a single public agency, the Department of Water Resources. In this case, by contrast, there is no evidence that Plaintiff has invested in any

---

[24] It is unclear to the court whether companies selling "in the competitive public marketplace" as described in the quoted passage above sold at wholesale or at retail.

[25] It appears that 21 of 43 independent power producers had contracts with the Department of Water Resources. *Id.* at 435.

material plant or equipment financed by the public, or that it depends on long-term contracts for sales to public entities for its cash flow.[26]

Finally, Defendant refers the court to *Delmarva Power & Light Co. v. Division of Taxation*, 23 NJ Tax 188 (2006). The taxpayer in that case (Delmarva) sold electricity at retail as a regulated utility in three states other than New Jersey. However, all of Delmarva's New Jersey customers were regulated public utilities, and Delmarva's New Jersey sales were solely at wholesale. *See* 23 NJ Tax at 192. Delmarva had less than 10 percent of its property and none of its payroll in New Jersey, and it derived two percent or less of its revenue from sales to customers in New Jersey. *Id.* at 192-95. The New Jersey public utility regulatory body treated Delmarva as not subject to regulation.

The case involved which of two New Jersey taxes applied to Delmarva, as between the Corporation Business Tax (a net income tax) and the Franchise and Gross Receipts Tax (the F&GRT). The F&GRT applied only if Delmarva was within the definition of "public utility" pursuant to the public utility statutes: "[E]very *** corporation *** that now or hereafter may own, operate, manage or control within this State any *** electricity distribution *** system, plant or equipment *for public use*, under privileges granted *** by this State ***." *Id.* at 198-99 (quoting NJ Statutes Annotated 48:2-13) (emphasis added). Delmarva argued that it was a public utility and thus subject to the F&GRT and exempt from the Corporation Business Tax.[27] *See Delmarva*, 23 NJ Tax at 191.

The court found that it was not bound by the state regulatory body's conclusion that Delmarva was not subject to regulation as a public utility. *Id.* at 199. Accordingly, the court proceeded to analyze whether the company "owned" an "electricity distribution *** plant" within New Jersey "for public use." The court held that Delmarva fit within the

---

[26] Plaintiff asserts, and Defendant does not contest, that it "did not own or operate any equipment or facilities used for the production or storage of electricity or gas in Oregon." The limited data in the record regarding Plaintiff's sales say nothing about contractual terms.

[27] Although it claimed to be "subject to" the F&GRT, Delmarva argued that it had no liability for that tax because wholesale sales were exempt.

definition, relying heavily on the fact that Delmarva's property in the state included a one percent interest, as a tenant in common, in an electricity generation plant and transmission line in New Jersey, "both of which were employed in public use ***." *Id.* at 200. The court stated:

> "Although Delmarva only made wholesale sales of electricity to its customers in New Jersey, those sales were employed for public use as the public was the end user of the electricity. By virtue of its Certificate of Authority, Delmarva was specifically authorized to carry on within New Jersey, activities related to its business which was primarily that of a public utility. It operated a part of its public utility business in New Jersey, owning utility assets which create the majority of Delmarva's revenue. Its ownership in the [transmission facility] was also approved by the [New Jersey Board of Public Utility Commissioners (NJBPUC)]. *** Delmarva had an actual presence in and over New Jersey's public streets. The conductor wires of the [transmission facility], in which Delmarva had an ownership interest, intersected and extended into and over those streets and highways. The NJBPUC approved the transfer to Delmarva of an ownership interest in these portions of the [transmission facility]. In doing so, the NJBPUC necessarily granted to Delmarva all of the privileges incident to that ownership. Thus, I conclude that Delmarva was utilizing its corporate franchise and other privileges to conduct its electric utility business in New Jersey, and therefore was a New Jersey public utility for purposes of its summary judgment motion."

*Id.* at 202-03. The court went on to resolve the ultimate issue regarding the application of the two taxes.[28]

As with *Independent Energy Producers*, this court does not read *Delmarva* as holding that wholesale sales of electricity, without more, necessarily cause a company to put its property to "public use." As the quoted passage shows, the New Jersey Tax Court relied on multiple facts for its conclusion. That "the public was the end user of the electricity" was one fact. The court gave far greater discussion, however,

---

[28] The court held that Delmarva's lack of retail sales made it not "subject to" the F&GRT; therefore, Delmarva was not exempt from the Corporation Business Tax, and the court denied Delmarva's claim for a refund of that tax. *Id.* at 207; 211.

to Delmarva's partial ownership in New Jersey generation and distribution facilities, even though its ownership interest was small and its role was passive.

Plaintiff points out that, shortly after *Independent Energy Producers* and *Delmarva*, the Oregon Public Utility Commission determined that a company proposing to own electricity transmission facilities to be leased to the Bonneville Power administration (BPA) would not be a "public utility" within the commission's jurisdiction. The BPA argued that no "public use" was present because the company leased its facilities to the BPA rather than furnishing transmission service to the public. The commission agreed, concluding that "[t]here would be no 'holding out' of the facilities to the public ***." The commission relied in part on *Central Oregon Irrigation*. Decl Ruling, Oregon Public Utility Commission (May 9, 2007), *available at* 2007 WL 1415655. Although the ruling is brief and (just like *Independent Energy Producers* and *Delmarva*) does not bind this court, it tends to support Plaintiff's point that a company does not put its property to public use when the public has no right to buy the resulting commodity from the company itself.

Thus, even assuming that the 1965 legislature intended its definition of "public utility" to incorporate a "broad and flexible" definition of "public use" that would adapt to changing business models (a proposition on which the court expresses no opinion), none of the cases persuade the court to change its conclusion based on the text and contemporaneous context. The court now turns to legislative history for any final insights.

4.   *Legislative history*

The court considers two bodies of legislative history: materials from the 1965 Oregon legislative session, and comments and background materials from the drafters of UDITPA. *See Powerex*, 357 Or at 64-65 (considering both sets of materials). Because of the unusual nature of the UDITPA definition of "public utility," the court starts with the materials from the UDITPA drafters, including their published comments.

The drafters generally attempted to provide a complete, readymade bill for state adoption, including even placeholder language to list the provisions of state law being repealed and replaced, and an effective date. *See* Copy of Uniform Division of Income for Tax Purposes Act, Reproduced by Council of State Governments (Jan 1965) *in* bill tracing materials for HB 1003 (1965) ("January 1965 UDITPA"). However, the drafters placed brackets around two significant substantive provisions, the definition of "public utility" and portions of the definition of "financial organization," which are the only two types of businesses excluded from UDITPA. January 1965 UDITPA at 1-2. The drafters' official comment, which is included in the legislative record, states: "It is expected that 'public utility' will be defined to include all taxpayers subject to the control of the state's regulatory bodies on the theory that separate legislation will provide for the apportionment and allocation of the income of such taxpayers." *Id.* at 2. Transcripts of the proceedings of the drafters describe the exclusions as optional to each state. Proceedings in the Committee of the Whole, Uniform Division of Income for Tax Purposes Act at 7 (Aug 22, 1956) *in* bill tracing materials for HB 1003 (1965) ("it was felt that most states would wish to exclude the public utilities because they are presently governed by special laws") (statement of George V. Powell, presenter).[29] Committee chair Powell later added: "It is intended here that the state will insert the definition of public utility which appears in its regulatory statutes. For instance, the language here relating to the sale of oil and oil products does not intend to exempt a company operating service stations. The intent is to cover the large companies which approach public utilities and are subject to regulation. The purpose is to indicate that this is the place where the businesses subject to regulation of one type or another are to be excluded." Proceedings in the Committee of the Whole, Uniform Division of Income for Tax Purposes Act at 27-28 (July 9, 1957, morning).

---

[29] Powell chaired the committee of the National Conference of Commissioners on Uniform State Laws that drafted UDITPA. *See* Arthur D. Lynn, Jr., *Formula Apportionment of Corporate Income for State Tax Purposes: Natura Non Facit Saltum*, 18 Ohio St LJ 84, 95 n 36 (1957).

This legislative history shows that the drafters clearly expected and intended that states would insert their own definitions corresponding to those that had evolved in each state for regulatory purposes. In keeping with their turnkey approach to drafting the uniform bill, however, the drafters included a definition of "public utility" that they apparently viewed as generic and thus likely to encompass those companies subject to regulation in all or most states. The court has found no discussion in the UDITPA drafters' materials of the reference to "public use." Nothing in those materials changes the court's conclusions based on the text and context. Turning to the Oregon-specific legislative history, the Oregon legislature modified UDITPA's definition of "public utility" by essentially inserting the word "principal." The following comparison illustrates Oregon's change to the language of the UDITPA drafters:

> "'Public utility' {means any business entity ~~which owns or operates~~ whose principal business is ownership and operation for public use of any plant, equipment, property, franchise, or license for the transmission of communications, transportation of goods or persons, or the production, storage, transmission, sale, delivery, or furnishing of electricity, water, steam, oil, oil products or gas.}"

*Compare* January 1965 UDITPA *with* Or Laws 1965, ch 152, § 2 (strikethrough indicates text deleted by Oregon legislature; underscoring indicates text inserted by Oregon legislature). Carlisle Roberts, then counsel to Defendant's predecessor the State Tax Commission, and later judge of this court, testified at an early hearing of the House Committee on Taxation. In summarizing several of the definitions now codified in ORS 314.610, Roberts gave the following overview of the UDITPA definition of "public utility" and the proposed change:

> "Public utilities, as in Oregon law, are placed in a special category. 'Any business entity whose principal business is ownership and operation for public use of any plant, equipment, property, franchise, or license for the transmission of communications, transportation of goods or persons, or the production, storage, transmission' and so on. Now we changed one word in this. Under the Uniform Act, public utility means 'any business entity whose *business* is

ownership \*\*\*.' The reason we changed it to *principal* business is that in our curious state of Oregon you will find a large paper mill, for example, acting as a public utility for the town. But it's not its principal business. Under the Uniform Act, this would become a public utility and would be subject, somebody might argue, to the—a tax upon its— what we'd regard as its main business. So we made that one change."

Testimony, Carlisle Roberts, House Committee on Taxation, Jan 22, 1965, Tape 1, Side 1 (emphases added). The committee raised no questions about this explanation, and the court has found no further discussion of any part of the definition of "public utility."

The court considers Roberts' testimony in light of the contemporaneous definition of "public utilities" for regulatory purposes. The court finds it striking that the only change the 1965 legislature made to the UDITPA definition seems to conform to the "company town" exclusion from "public utilities" in ORS 757.005(2)(b) (1963). That exclusion, reprinted in a footnote above, applied to any "industrial concern" that furnished heat, light, water or power to local inhabitants without profit to itself. The remaining components of the UDITPA definition, which the Oregon legislature adopted without change, otherwise appear to overlap substantially with businesses then under the jurisdiction of the Oregon Public Utility Commission: UDITPA's reference to "transmission of communications" encompasses the narrower "conveyance of telegraph or telephone messages" in ORS 757.005(1)(a) (1963). UDITPA's "transportation of goods or persons" seems to sweep in both "transportation of persons or property by \*\*\* street transportation as common carriers" in ORS 757.005(1)(a) (1963) as well as transportation by "railroads" and "motor carriers" as defined and regulated pursuant to ORS chapters 760 and 767 (1963), respectively. UDITPA's "production, storage, transmission, sale, delivery, or furnishing of electricity, water, steam, oil, oil products or gas" aligns broadly with "the production, transmission, delivery or furnishing of heat, light, water or power" in ORS 757.005(1)(a) (1963).[30]

---

[30] "Heat," in ORS 757.005(1)(a) (1963), seems to have included natural gas. *See* ORS 757.605(5) (defining "utility service" to include gas or electricity distribution

Overall, the Oregon legislative history sheds little light on this case. In context, Roberts' statements seem to indicate an intention to generally conform the new UDITPA definition of "public utility" to the existing body of businesses subject to Oregon regulation. However, the Oregon legislature clearly stopped short of requiring that a "public utility" for UDITPA purposes actually be subject to regulation by the Oregon Public Utility Commission. No words or cross-references to existing statutes indicate such an intention. *Cf.* ORS 305.655 (1967) (defining "public utility" for purposes of Multistate Tax Compact based in part on regulatory status).[31] The overlap between the terms in the UDITPA definition and those in the regulatory definition is substantial, but far from precise. The legislature seems to have viewed the UDITPA definition it received from the drafters as a black-letter expression of the concept of a public utility, and it narrowed that expression so that the sole type of taxable entity that was excluded from the regulatory definition would also be excluded from the UDITPA definition. The court finds no basis to conclude that the legislature meant the phrase "public use" within that definition to have a meaning different from the dictionary definition discussed above.

5.  *Conclusion on public utility status*

The court concludes that the 1965 legislature used the phrase "public use" in ORS 314.610(6) as a technical term. Among other things, that term required that some segment of the public must acquire a right to buy or otherwise use a company's commodity or service before the company

---

systems for purposes of allocating service territories among providers). The court notes that its comparisons of UDITPA and the former public utility statutes in this paragraph are illustrative only; the court does not view any comparisons as binding in future cases.

[31]

"'Public utility' means any business entity (1) which owns or operates any plant, equipment, property, franchise, or license for the transmission of communications, transportation of goods or persons, except by pipe line, or the production, transmission, sale, delivery, or furnishing of electricity, water or steam; *and* (2) *whose rates of charges for goods or services have been established or approved by a federal, state or local government or governmental agency.*"

*Id.* at Art IV, § 1(f) (emphasis added).

could be considered to have put its property in public use. The uncontested evidence in this case shows that no segment of the public has acquired any such right. Therefore, Plaintiff was not a "public utility" within the meaning of ORS 314.610(6).

B.  *Other Issues*

Because the court concludes that Plaintiff was not a public utility, Defendant erred in classifying Plaintiff as such and subjecting it to Defendant's 2015 administrative rule, now codified as OAR 150-314-0090. Plaintiff was subject to Oregon's UDITPA, and its sales must be sourced according to the Oregon UDITPA rules. The court, therefore, need not reach whether Defendant improperly promulgated the rule or improperly applied it retroactively.

## IV.  CONCLUSION

Now, therefore,

IT IS ORDERED that Plaintiff's cross-motion for partial summary judgment is granted; and

IT IS FURTHER ORDERED that Defendant's motion for partial summary judgment is denied.